**Van M. HAFFORD, Plaintiff–Appellant,**

v.

**Larry SEIDNER, Warden, Lorain Correctional Institution, Ohio Department of Rehabilitation and Correction, Defendant–Appellee.**

No. 97–4240.

United States Court of Appeals, Sixth Circuit.

Argued: Oct. 30, 1998.

Decided and Filed: July 12, 1999.

Thomas K. Mast (argued and briefed), Maniscalcot Holt, Cleveland, Ohio, for Plaintiff–Appellant.

Robert L. Griffin, Assistant Attorney General (argued and briefed), Winston M. Ford (briefed), David P. Katko, Office of the Attorney General of Ohio, Employment Law Section, Columbus, Ohio, for Defendant–Appellee.

Before: DAUGHTREY and MOORE, Circuit Judges; COHN, District Judge.*

## AMENDED OPINION

COHN, District Judge.

This is a race and religion-based hostile work environment and retaliation case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Plaintiff–Appellant Van M. Hafford (Hafford) appeals from a decision granting summary judgment in favor of Defendant–Appellee Larry D. Seidner, Warden of the Lorain Correctional Institution (Lorain), Ohio Department of Rehabilitation and Correction (ODRC). Hafford, a Correction Officer at Lorain, directed his claims against ODRC as an employer. For the reasons that follow, the decision will be affirmed as to all claims except the claim of race-based hostile work environment under Title VII.

### I.

 In reviewing a summary judgment decision, we must view the facts and all inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A.

Hafford, an African–American and a member of the Muslim religion, has been a correction officer at Lorain since September 8, 1992. He did not pass his initial probationary period of 120 days. After the warden at the time extended the peri-

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michi-gan, sitting by designation.

od an additional 60 days, Hafford passed his probation and became a permanent employee in March 1993.

Beginning in February 1993, several incident reports were filed involving Hafford and other correction officers. On February 28, 1993, Christopher Seitz (Seitz) reported that he observed Hafford shaking hands with an inmate; that later in the evening, when an inmate requested ice to perform a Muslim ritual, Hafford challenged an order Seitz gave to the inmate in the inmate's presence; and that Hafford repeatedly screamed "Allah is no joke" at Seitz in the inmate's presence. Hafford's report provided a different account of the incident. Hafford reported that he had observed Seitz mocking a Muslim inmate about his faith and that Hafford refused Seitz's invitation to participate in the mockery. An investigation found both officers responsible, each was issued a Notice of Alleged Misconduct, and neither was disciplined. After this incident, four other correction officers told Hafford they heard he had prayed with Muslim inmates, and asked if this was true. Hafford received a telephone call on the prison's internal telephone system stating, "you're dead." Hafford recognized the caller as Seitz. He received the same call again later, and this time recognized the caller as a different correction officer. Hafford orally reported these incidents to his supervisors. No action was taken.

In April, 1993, a riot broke out at another correctional facility in Ohio involving a Muslim group of inmates among others. The warden and deputy warden asked Hafford to refrain from fraternizing or according special treatment to Lorain's Muslim inmates or greeting them in Arabic until the situation at the other facility stabilized. During the meeting the wardens spoke in an offensive and contemptuous manner about his Muslim faith and accused him of participating in a holy war. The deputy warden threatened Hafford with loss of his job and expressed concern about the effect of his religious expression on "my Aryan Officers."

Hafford contacted the ODRC Bureau of Equal Opportunity to report that he had received death threats and other harassment from co-workers based on race and religion and that management was hostile to him. The warden at the time then met with Hafford regarding the death threats. The warden demanded that Hafford stop praying with the inmates and referred to Hafford's religion in a contemptuous manner.

In May or June 1993, Hafford's request for transfer to another facility was granted. In July, however, the warden of that facility informed Hafford that his probationary period at the facility was not successful and that he would be transferred back to Lorain. During the meeting, Hafford started to read to the warden from the Koran. The warden responded: "That's the problem."

When Hafford returned to Lorain in November he experienced increased hostility. He reported that another correction officer, Officer Zech, referred to him in a racially offensive manner. One month later he specified that Officer Zech had referred to him as a "black-ass fucking nigger." Immediately after the report, Officer Zech went on disability leave due to a broken leg. When he returned in March, a pre-disciplinary hearing was scheduled, and then rescheduled, and ultimately held in May. Soon after Lorain responded to a written inquiry from the EEOC regarding the incident, Zech was issued the notice of pre-disciplinary hearing. Two months after the hearing, and eight months after the investigated behavior, Officer Zech was issued a written reprimand.

In January, 1994, Hafford reported receiving harassing and threatening calls over Lorain's internal phone system. On January 11, 1994, a caller stated, "You wanta swang, bitch." Hafford interpreted this phrase to refer to race-related lynching. He conducted his own investigation of the identity of the caller over the inter-

nal phone system by calling and questioning several officers. Because he made the calls without authorization he was given a Notice of Alleged Misconduct. Hafford submitted a report dated January 15, 1994, and marked as being received after a January 31, 1994 meeting, in which he reported the following regarding the anonymous caller:

> based upon the microsounds and sound effects of tonality and voice, I hold Officer Trease in contempt of Allegations of Illegal activity, and also Officer Williams whom were both working 9A. Officer Williams is having marital problems. Officer Trease is a immature officer and was also trying to impress officer Williams. Sexism is the # 1 cause of crime. I also hold Lt. Robinson and Capt. Darling in contempt of "The Ohio Ethics Law and Related Statutes."

In another report, dated January 11, 1994 and marked as being received on January 31, 1994, Hafford again identified Officers Trease and Williams as the officers involved in the anonymous phone call. A handwritten notation in the "Disposition By Warden" section of the report, and the text written by Hafford, indicate that an announcement was made to the general work force at roll call concerning misuse of the internal phone system. It does not appear that Trease and Williams were ever questioned, or that any investigatory action was taken.

On January 16, 1994, Hafford reported receiving another anonymous phone call in which the caller hissed "niggaaaah." A handwritten notation in the "Disposition By Warden" section of the report states: "Rick please ask CO Hafford to identify who he believes the caller is and an incident report so we can investigate." Hafford filed a second report dated January 16, 1994, in which he identified the caller as Officer Brewer. It does not appear that any investigatory action was taken.

Hafford was subsequently disciplined on several occasions. In April, Hafford's request for a Saturday off was denied on the ground that three other people had already requested the day off. On Saturday, Hafford called in sick stating that he was fatigued from picking up his daughter. He was issued a Report of Corrective Counseling. In July, Hafford was issued another Report of Corrective Counseling for writing an incident report and then writing another report five months later with a substantially different factual rendition of the same incident.

On April 23, 1994, Hafford met with Captain Darling who made offensive and threatening statements to him, including asking whether he was scared to die, and telling Hafford that Hafford's religion dictated that he hate white people. On July 22, 1994, Hafford reported that an anonymous caller made a derogatory remark. In a report dated the same day, Hafford reported another incident in which he asked Officer Thomas who was calling for him and the officer replied: "They said it's the 'Grim Reaper' and hung up the phone." The report indicates that Officer Thomas was consulted concerning the issue. In the "Action Taken" section of both reports, the Captain wrote: "Called every unit and told the officers to stop the behavior."

On February 24, 1995, Hafford filed charges with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC), alleging discrimination based on race and religion. In the ensuing months, several correction officers spoke to Hafford in an offensive and threatening manner. On June 2, 1995, Hafford reported that a correction officer pointed a gun at him. In response, Warden Seidner contacted the Ohio State Highway Patrol which conducted an official investigation. The investigation revealed that Hafford was "not telling the complete truth" and was "trying to deceive the institution."

On February 27, 1996, during the course of a training session on security threat groups, the subject of Muslim inmates as a security threat group was raised. Hafford

took this as a statement that all Muslims are gang members and confronted the officer conducting the training in an abusive manner.

In March 1996, Hafford wrote a note to the wife of a correction officer asking her for a date. He referred to the officer as an "Uncle Tom," a "snitch," and a "slave." When confronted, he denied writing the letter. Hafford was issued a written reprimand. During his deposition, Hafford admitted writing the note, destroying it and later declaring that he had not written it.

Prior to and throughout the course of Hafford's employment at Lorain, he applied for several positions with the Adult Parole Authority (APA) and transfers within ODRC. From January 2, 1992 to September 25, 1992, Hafford was rejected by the APA 12 times. In 1993, he received three more rejections, and in 1994, he received 19 more.

### B.

On August 11, 1995, the EEOC sent Hafford a Notification of Right to Sue. On November 11, 1995, Hafford filed this action against his employer asserting the following claims: (1) discrimination and hostile work environment based on race; (2) discrimination and hostile work environment based on religion; and (3) retaliation.

The district court referred all pre-trial motions to a magistrate judge. The magistrate judge submitted a report and recommendation in which she recommended that the court grant summary judgment in favor of defendant on the claim for hostile work environment based on religion on the ground that the concerns expressed by the wardens during the riot situation, and comments regarding Hafford praying with other inmates, were legitimate. The magistrate judge recommended denying dismissal of the claim for hostile work environment based on race, however, on the ground that a reasonable jury could find that Hafford was subjected to a racially hostile environment which unreasonably affected his work performance and that his employer failed to reasonably respond to the situation. In addition to the incidents attested to by Hafford as described above, the magistrate judge considered the affidavit of Wayne McDowell, an employee of another correctional institution who had served as a union representative and, in 1993, was appointed a member of the Joint Committee on Correctional Institutions which conducted a system-wide review of Ohio's correctional institutions. McDowell described incidents of past racially hostile conduct at the Lorain facility. A licensed social worker concluded that Hafford met the criteria for post-traumatic stress disorder and had experienced events that involved threatened death or serious injury to himself. The magistrate judge held that a jury could find Lorain had failed to take reasonable steps to eliminate the harassment directed toward Hafford in that Lorain did not timely respond to the anonymous phone threats. Even if Hafford had not identified the caller until 20 days after the incident, steps could have been taken to investigate the calls.

The magistrate judge also recommended granting summary judgment in favor of defendant on the retaliation claim on the ground that other than loose temporal proximity, Hafford did not show any evidence of a causal link between his filing of administrative agency complaints and the multitude of disciplinary actions taken against him.

The district court adopted the magistrate judge's recommendation in all respects except the recommendation to deny summary judgment on the claim for hostile work environment based on race. The district court determined that Hafford could not establish liability because no reasonable juror could find that Lorain did not reasonably respond to the phone calls or other reports. Those of Hafford's reports which were not investigated were not decipherable.

## II.

We review a district court's grant of summary judgment de novo. See *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996), cert. denied, 519 U.S. 1055, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

### A.

■ The § 1981 claims against ODRC are barred by the Eleventh Amendment of the United States Constitution. *Foulks v. Ohio Dep't of Rehabilitation and Correction,* 713 F.2d 1229, 1232–33 (6th Cir.1983); *Freeman v. Michigan, Dep't of State,* 808 F.2d 1174, 1178–79 (6th Cir.1987). The Title VII claims are not. *Id.* Our discussion will therefore be limited to the Title VII claims.

### B.

■ Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] religion." 42 U.S.C. § 2000e–2(a)(1). The scope of prohibition is not limited to economic or tangible discrimination. *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Discrimination so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment" violates Title VII. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ "The elements and burden of proof are the same, regardless of the discrimination context in which the claim arises." *Crawford v. Medina Gen'l Hosp.,* 96 F.3d 830, 834 (6th Cir.1996); *Allen v. Michigan Dep't of Corrections,* 165 F.3d 405 (6th Cir.1999). In order to establish a prima facie case of hostile work environment based on either race or religion, Hafford must establish the following five elements:

1. He was a member of a protected class;

2. He was subjected to unwelcomed racial and/or religious harassment;

3. The harassment was based on race or religion;

4. The harassment had the effect of unreasonably interfering with Hafford's work performance by creating an intimidating, hostile, or offensive work environment; and

5. The existence of employer liability.

See *Risinger v. Ohio Bureau of Workers' Compensation,* 883 F.2d 475, 484 (6th Cir. 1990). In determining whether an environment is one that a reasonable person would find hostile or abusive and that the plaintiff in fact did perceive to be so, courts look at all of the circumstances, including:

[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 251 (6th Cir.1998). "A recurring point" in the Supreme Court's opinions is that " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' " and that "conduct

must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, ——, 118 S.Ct. 2275, 2283–84, 141 L.Ed.2d 662 (1998) (citations omitted).

### C.

 Hafford seeks to hold his employer liable for harassment by both co-workers and supervisors. Employer liability for co-worker harassment is based directly on the employer's conduct. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 n. 11 (6th Cir.1994). An employer is liable if it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* at 804, quoting, *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 621 (6th Cir.1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), abrogated in irrelevant part, *Harris v. Forklift Systems, Inc., supra.* In contrast, employer liability for supervisor harassment is vicarious. *Pierce*, 40 F.3d at 803. The Supreme Court recently decided the appropriate standard for actionable discrimination caused by a supervisor. *Faragher, supra.* "In order to accommodate the principle of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and a saving action by objecting employees," the Supreme Court adopted the following standard:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. R.Civ.P. 8(c). The defense comprises two necessary elements: (a) that the

employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.

524 U.S. at ——, 118 S.Ct. at 2292–93.

### D.

#### 1.

 The evidence of a racially hostile work environment significantly affecting Hafford's ability to perform his job is sufficient to warrant consideration by a jury. According to this evidence, Hafford's supervisors and fellow correction officers engaged in a pattern of racial harassment consisting of not only racial slurs, but also physical threats. See *Allen v. Michigan Dep't of Corrections, supra* (characterizing a threatening letter referring to lynching as plaintiff's "most disturbing evidence of racial harassment").

 Hafford has also shown a genuine issue of material fact as to employer liability, both in terms of his employer's alleged failure to "implement prompt and appropriate corrective action" in response to the conduct of Hafford's co-workers, and its vicarious liability for the alleged harassing behavior of its supervisors and failure to "exercise[ ] reasonable care to prevent and correct promptly" the behavior. While ODRC has a stated policy against discrimination,[1] a jury could find on this record

---

1. ODRC's Standard of Employee Conduct Rule 14(a) states that "[a]cts of discrimination on the basis of race, color, sex, age, religion, national origin, handicap, or sexual orientation" may be punishable by a written reprimand on the first offense, a five to ten day

that Hafford's employer knew of, and failed to respond appropriately to the behavior directed toward Hafford. Hafford made written reports informing his employer of the events. Although these reports often included nonsensical comments, Hafford set forth the necessary information in a manner sufficiently intelligible to warrant attention.

In examining the institution's response to Hafford's reports, the magistrate judge was particularly concerned over the degree of attention given to the telephone threats. The institution responded by making a general announcement regarding improper use of the internal telephones and, later, by individually calling officers to request that the conduct stop. But neither individual calls nor interviews were taken after the first of the racially abusive phone calls received by Hafford, despite the fact that Hafford was reprimanded for attempting his own investigation. Earlier action may have discouraged the later calls and other conduct toward Hafford. Prior to Hafford identifying the callers little was done to determine their identity, and after Hafford identified the callers no investigation was made of the identified individuals. In light of the telephone threats, and all of the other acts of harassment directed toward Hafford, a factfinder could conclude that the employer's response did not constitute "prompt and appropriate corrective action." Cf. *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997), cert. denied, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (action implemented by employer held to be "prompt and appropriate" where "[g]iven the circumstances before it, there was little else, if anything it could do"). This record precludes summary judgment.

### 2.

■ We agree with the district court that Hafford did not demonstrate a triable

issue over whether he was subjected to a hostile work environment based on religion. As evidence of an environment that a reasonable person would find hostile or abusive, Hafford points to: (1) the supervisor's accusation that he was preparing for a "holy war," (2) the meeting in which Hafford alleges the warden mocked the Muslim greeting and falsely accused Hafford of preaching and praying with the inmates because he permitted and responded to inmates' use of the Muslim greeting; and (3) Captain Darling's statements that Hafford's religion taught him to hate white people.

This evidence is insufficient to show a hostile work environment affecting Hafford's performance. The objections to Hafford communicating with the inmates in Arabic as part of the Muslim greeting appear to be a legitimate concern over fraternization of a correction officer with prison inmates. The "mocking and contemptuous" comments regarding the greeting are not specified. The comments which are specified are not sufficient to meet the Supreme Court's standard that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" and that "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher, supra.*

### E.

■ We recognize that the overall harassment Hafford experienced may not have been based exclusively on his race but also on hostility to him as a "black Muslim." In at least one instance—Captain Darling's comment—the link between the racial and religious bias was explicit. The theory of a hostile-environment claim

suspension on the second offense, and removal on the third offense. Rule 13 prohibits the use of abusive or obscene statements to or concerning another employee. Rule 20 prohibits "threatening and/or intimidating another employee." The "Investigations" section of the rules sets forth procedures for investigating all rule violations.

is that the cumulative effect of ongoing harassment is abusive. It would not be right to require a judgment against Hafford if the sum of all of the harassment he experienced was abusive, but the incidents could be separated into several categories, with no one category containing enough incidents to amount to "pervasive" harassment. Although there is enough evidence of racial harassment for that claim to stand on its own, the district court should allow at trial for consideration of the possibility that the racial animus of Hafford's co-workers was augmented by their bias against his religion. See *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415–17 (10th Cir.1987) (answering in the affirmative the question "whether incidents of racial harassment which may, by themselves, be insufficient to support a racially hostile work environment claim can be combined with incidents of sexual harassment to prove a pervasive pattern of discriminatory harassment in violation of Title VII"); cf. *Conlin v. Blanchard*, 890 F.2d 811 (6th Cir.1989) (allowing white men to pursue sex discrimination claim based on affirmative action policy that sought to increase employment of women and racial minorities).

### IV.

Hafford also claims retaliation. To establish a prima facie case of retaliation, Hafford must show that: (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990).

Hafford was disciplined five months (August 1993) and ten months (January 1994) after he filed the OCRC and EEOC charges. In February 1994, after he filed these charges, four disciplinary actions were taken that year, and seven disciplin-ary actions were taken over a seven month period the next year. We agree with the magistrate judge that "[b]ecause the disciplinary actions occurred two to five months after Hafford filed charges, and are fairly evenly spread over a period of time, the inference of a causal connection based on temporal proximity alone is tenuous." Absent additional evidence, this loose temporal proximity is insufficient to create a triable issue.

### V.

For the reasons stated, we AFFIRM the district court's grant of summary judgment to defendant on Hafford's § 1981 claims and Title VII claims for religion-based hostile work environment and retaliation, and REVERSE the district court's grant of summary judgment to defendant on Hafford's Title VII claim of race-based hostile work environment based on the conduct of his fellow correction officers and supervisors. We therefore REMAND this case to the district court for further proceedings in accordance with this opinion.