NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0099n.06
Filed: February 8, 2006

Case No. 04-4094

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL KELLY, | : | |
| | : | |
| Plaintiff/Appellant, | : | On Appeal from the United States District |
| | : | Court for the Northern District of Ohio |
| v. | : | |
| | : | |
| SENIOR CENTERS, INC., JULIE | : | |
| DANGELO, KAY CLAWSON, | : | |
| | : | |
| Defendants/Appellees. | : | |

Before: COLE and ROGERS, Circuit Judges; BECKWITH, District Judge.[*]

BECKWITH, C.J., delivered the opinion of the court, in which ROGERS, J., concurred except as

to Part II.B.2. ROGERS, J., (pp. 18)delivered a separate opinion, in which COLE, J., concurred, in

part, which is the opinion of the court as to Part II.B.2. COLE, J., (pp. 20) delivered a separate

dissenting opinion.

Judge Beckwith would affirm on all the claims as to which the district court granted

summary judgment. Judge Rogers would reverse and remand the summary judgment on the claim

for retaliatory discharge, but affirm the summary judgment on the hostile work environment claim.

Judge Cole would reverse on both claims. Summary judgment is therefore reversed and remanded

on the claim for retaliatory discharge, but affirmed on the claim for hostile work environment.

_____

[*] The Honorable Sandra S. Beckwith, Chief Judge, United States District Court for the
Southern District of Ohio, sitting by designation.

BECKWITH, District Judge. Michael Kelly appeals the district court's grant of summary judgment to the defendants in Kelly's Title VII action. Kelly claimed that he was terminated from his employment with Senior Centers because he complained about racial slurs, foul language, and crude sexual jokes. Kelly also alleged that his fellow employees singled him out for verbal abuse after he complained, creating a hostile work environment.

I.       Background.

Michael Kelly was hired by Senior Centers as the Director of the "Foster Grandparents Program" in November 2001. Senior Centers is a non-profit agency that provides programs and services for senior citizens in Lucas County, Ohio. The federally-sponsored Foster Grandparents Program matches low-income senior citizens with at-risk or special needs children in the community. The FGP is the only Senior Centers' program that is income-based; participants must have incomes at or below the federal poverty guidelines. The vast majority of the senior citizens in the FGP are African-American. Kelly is Caucasian and a self-described devout Christian.

As the FGP Director, Kelly had an assistant, Cathy Pinney. Defendant Julie Dangelo is the Executive Director of Senior Centers and was Kelly's supervisor. Sherri McNeill is the Center's Assistant Director, and Richard Gee is the Center's program coordinator. All of these staff members are Caucasian. Defendant Kay Clawson is a member of the Center's Board of Directors.

Dangelo and McNeill gave Kelly a new employee orientation when he started as FGP Director. This included Kelly's acknowledged receipt of the Center's equal employment policy, personnel policies, grievance and complaint procedure, and a policy statement on sexual harassment.

That policy stated that any complaints of harassment should be reported to Dangelo, or to the Center's personnel director, or to the President of the Center's Board of Directors.

Kelly alleges that Dangelo and McNeill made repeated disparaging remarks about the foster grandparents, remarks that began during his orientation session. He alleges that they referred to the grandparents as "totally disgusting pigs" with "disgusting eating habits" and "nasty behavior." Early in Kelly's tenure at the Center, Richard Gee told him to be sure to "purchase plenty of bananas" for an in-service event for the volunteers "because the little monkeys really enjoy their bananas." Gee also used very offensive language, and told crude sexist and racist "jokes" which Kelly objected to. Gee's response was "Oh Jesus Christ, now I suppose we have a Holier than Thou new director." Later on, Gee asked Kelly to give flyers to the FGP volunteers for a St. Patrick's Day Jigg's Dinner because, Gee said, Kelly had "plenty of Jiggers that would like to attend." Gee also told a racially charged joke to Cathy Pinney, which Kelly overheard. The joke was "What two syllable word do whites hate to hear associated with blacks?" The punch line was "Neighbor." When Kelly again objected, Gee again accused Kelly of having a "holier than thou attitude." (A former FGP director stated that Gee said when a Hispanic employee and her daughter arrived at the Center one day, "Here come the Mexicans.")

Kelly asserts that Dangelo heard many of these inappropriate remarks and just laughed. Kelly also claims that he wrote a memo to Dangelo, describing the objectionable racial comments, and that Dangelo refused to accept it, telling Kelly that "we don't do memos here." Dangelo allegedly told Kelly that he should follow the grievance policy if he was unhappy, but also told Kelly that she

represents the Board in everything, that she "handpicked her board and that they did what she asked them to do."

Kelly also asserts that Dangelo and McNeill made repeated racist comments and engaged in racist conduct. For instance, Kelly asserts Dangelo called an African-American member of Senior Centers' Board a "token black." Dangelo refused to have the first floor restrooms regularly cleaned because they were frequently used by the foster grandparents. Kelly claims that Dangelo complained that an African-American staff member used the second floor bathroom, which was also used by the administrative staff. During the FGP Christmas party, Dangelo allegedly told Kelly that "These pigs could care less about the decorations or the music Mike. They only get upset when you mess with their food, don't change the menu because they got to have their chicken." Kelly asserts that a janitor referred to the FGP program participants as "niggers" in front of Dangelo, and that she laughed even when Kelly asked the janitor to stop. Dangelo allegedly told Kelly that her staff had a right to act this way because they were treated so badly by the FGP volunteers over the years.

Cathy Pinney, Kelly's assistant, testified that she heard racially charged remarks and jokes during her tenure at Senior Centers. (Pinney resigned her position a few months after Kelly was terminated.) However, Pinney also participated in several incidents that Kelly found objectionable. Pinney put some cartoons on Kelly's desk that were sexually offensive. She and Dangelo allegedly joked on one occasion about their sex lives in front of Kelly. Kelly also asserts that many Center staff made liberal use of the "f" word, which he found offensive.

On December 14, 2001, Kelly met with McNeill to discuss possible reimbursement for an upcoming trip to Columbus. According to McNeill's written memo to Kelly's personnel file,

McNeill told him to check the personnel manual, but as a salaried employee he would not be entitled to comp time. Kelly then "blew up" at McNeill, "screaming that all I ever gave him were smart-ass answers to his questions." According to McNeill, Kelly ranted for a while longer, and could not give her examples of occasions when McNeill had not answered his questions. Instead, Kelly started complaining about Dangelo and her failure to communicate with him. Cathy Pinney and another employee, Vicki Goetz, overheard Kelly's outburst. Goetz called McNeill at home later, to be sure that McNeill was OK. McNeill urged Kelly to take his concerns directly to Dangelo. On the following Monday, Kelly returned to work as though nothing had happened and said nothing to Dangelo about the incident.

In December 2001, when Dangelo rebuffed Kelly's complaints about the racial and sexual conduct, Kelly contacted Laurel Shoaff, with the Corporation for National Community Service. CNCS is the federal funding agency for the FGP, and provides oversight and support services to the program. Kelly met with Shoaff and other CNCS staff in Columbus in December 2001 and reviewed his concerns about Senior Centers. In affidavits filed in the district court, Shoaff states that complaints about racial comments and discriminatory remarks at Senior Centers predated Kelly's arrival at the Center in November 2001.

Shoaff visited Senior Centers from Feb. 26 to March 1, 2002 for a planned evaluation and oversight visit. She met separately with Kelly, Pinney, the Senior Centers' Board of Directors, and other employees during the visit. Kelly again stated his concerns to Shoaff about the racial and sexual comments and jokes. Kelly also showed Shoaff some sexually themed cartoons and jokes which had been circulated at the Center. Shoaff's first affidavit (filed with Kelly's opposition to

Defendants' motion for summary judgment) unequivocally states that she spoke to Dangelo during an exit interview on March 1, 2002 about Kelly's complaints and her concerns over racial and sexual harassment. Shoaff signed a second statement some weeks after her first, in which she states she cannot be sure she said anything to Dangelo during her oversight visit to the Center. It is undisputed that Shoaff's written report, sent to Dangelo on April 3, 2002, stated in part that "Concerns regarding sexual, racial, national origin and religious harassment" were brought to her attention during her visit.

On March 19, 2002, Dangelo and the Centers' Board President Kay Clawson terminated Kelly's employment. A series of events that day led to the termination, apparently starting when Gee asked Kelly to buy some theater tickets for the FGP, which Gee said would cost $600. Kelly told Gee that he did not have independent authority for purchases over $500 and that he would have to ask Dangelo. A short time later, Kelly was outside his office and could hear Gee talking to Dangelo in the copy room, which was near Kelly's office. According to Kelly, Gee was telling Dangelo that Kelly made negative comments about Dangelo. At this point, Kelly went into the copy room and interrupted, saying that he wanted to respond to Gee's incorrect comments. Then, according to Kelly, Dangelo "started screaming" at him, told him to get out, and used her hand to push him down the hall to his office. Kelly told her to "get her hands off" and said she seemed "a little shocked" by his statement. Kelly alleges that Dangelo then shut the door to his office, and an argument ensued about Kelly's happiness and future at Senior Centers. Kelly admits that he criticized Dangelo's leadership, but claims it was because she had failed to respond to his concerns and complaints. He denies that he insulted her or demeaned her. Dangelo denies pushing Kelly, and

depicts the conversation behind his closed door as trying to talk to him about whether he was happy in his job. She asked Kelly if he wanted to continue working at Senior Centers, a question Kelly would not answer, telling Dangelo that decision was up to her. Dangelo said that Kelly was yelling at her very loudly, accused almost all the Senior Centers' staff of needing psychological help, and accused Dangelo of incompetence. Dangelo described Kelly's behavior as irrational, rude, insubordinate and threatening.

Because this was the second time that Kelly had gotten very angry at work, Dangelo called a Board member to help her. The first member she called was not available, so she called Kay Clawson and asked her to immediately come to the Center because Kelly was "out of control." Clawson said she could hear someone yelling in the background while she was talking to Dangelo on the telephone. Clawson arrived at the Center shortly thereafter, and stated that she could hear Kelly yelling upstairs when she arrived through the front door. When Clawson went upstairs, she saw Kelly pacing in the hallway. Clawson met with Dangelo in her office for about half an hour, and they decided to terminate Kelly due to his insubordination. Clawson and Dangelo then went to Kelly's office and told him this.

Kelly then asked Clawson if he could explain the situation. According to Clawson, Kelly was disjointed and not making sense, but was clearly unhappy at the Center. Clawson and Dangelo confirmed that Kelly's employment was terminated. He then folded up his rug and left the building. According to Kelly, he told Clawson about the racially charged comments, the cartoons, and the mistreatment of the FGP program. After listening for five minutes, Clawson again told Kelly he was fired, and he left the building involuntarily.

Kelly then brought suit claiming a hostile work environment and retaliation under federal and state law. After discovery, the defendants moved for summary judgment on all of Kelly's claims. The district court found insufficient evidence to support Kelly's hostile work environment claims. The district court also found that Kelly failed to show that Senior Centers' reasons for terminating him were pretextual, and granted summary judgment to the defendants. Kelly timely appealed.

II.     Standard of Review.

We review a district court's grant of summary judgment de novo. *Miles v. Kohli & Kaliher Assocs., Ltd.*, 917 F.2d 235, 241 (6th Cir. 1990). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We "must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 157 (6th Cir. 2004). This is especially true here when the parties so sharply disagree about Kelly's allegations concerning racial and sexual comments and harassment.

A.     Hostile Work Environment.

A hostile work environment is a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). A prima facie claim of a hostile work environment requires Kelly to show (1) he was a member of a protected class; (2) he was subjected to unwelcome racial, religious, or sexual

harassment; (3) the harassment was based on Kelly's race, sex, or religion; (4) the harassment had the effect of unreasonably interfering with Kelly's work performance by creating an intimidating, hostile, or offensive work environment; and (5) Senior Centers is liable for the creation of that environment. See *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). The key test is whether or not the alleged harassment is "severe or pervasive." A claim is evaluated both objectively and subjectively: "[t]he conduct must be severe or pervasive enough that a reasonable person would find [it] hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999), quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).

The district court properly concluded that Kelly could be a member of a protected class, although he is Caucasian, because the animus he was allegedly subjected to resulted from his advocacy on behalf of the overwhelmingly African-American foster grandparents in his program. See *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 574-75 (6th Cir. 2000). The district court also properly concluded that the same does not hold true of Kelly's sex and religious discrimination claims, as there was no evidence that any of the conduct he objected to was based upon his gender or his religion, or that of the foster grandparents.

The district court then found that Kelly failed to allege facts sufficient to meet the objective "severe and pervasive" standard for a racially hostile work environment. We agree with the district court. We assume that all of Kelly's allegations about racial comments and jokes, sexually crude cartoons, and liberal use of profanity are true. We deplore and reject such offensive conduct if it in fact took place. We repeat this Court's observation, in *NLRB v. Foundry Div. of Alcon Industries,*

*Inc.*, 260 F.3d 631, 635 (6ᵗʰ Cir. 2001), that it would behoove any prudent employer, "concerned with the climate in the workplace and recognizing the diversity of today's workforce, to condemn all such language and counsel employees and members against the use of any terms that denigrate and slur." Nevertheless, conduct that is deplorable, off-color, or offensive to our most basic value of according respect and dignity to every person, is not always legally actionable as a "hostile environment." It is well established that the court must consider the "totality of circumstances" in determining whether an actionable hostile environment exists. See *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6ᵗʰ Cir. 1999). Factors that may be considered in this determination include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance. *Hafford*, 183 F.3d at 512. And the conduct must be extreme; "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. at 512-513 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Kelly's charges of racial harassment consist of the two staff members' use of the pejorative slur word "nigger" referring to the foster grandparents; Dangelo's description of a Board Member as a "token black" and her comments that the foster grandparents were slovenly or were "pigs" at meals, and her alleged tolerance of others' conduct; Gee's three racist "jokes"; and comments about an African-American staff member's bathroom habits. While these incidents are deplorable and offensive, they do not amount to a pervasive, aggressive, or constant course of conduct. None of these incidents involved any physical threat to Kelly or to the foster grandparents. Indeed, there is

no evidence that any of the foster grandparents ever heard or were exposed to any of this conduct. The only incident that may have involved physical contact of any kind was the incident on Kelly's final day of employment, and that dispute was not prompted by any racial remark. While we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event.

Our conclusion is bolstered by examining the context of meritorious hostile work environment claims before this Court. For example, in *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999), the court held that a jury question existed based on evidence that supervisors routinely used the word "nigger" and other racial slurs and gave out "award" stickers for firing minority employees; workplace restrooms had graffiti stating "KKK is back" and depicting lynchings; Caucasian workers falsely accused an African-American worker of stealing $300 in an attempt to get that worker fired; an African-American worker's shirt was defaced with the slur "Nigger Sucker"; African-American workers were disproportionately disciplined by factory supervisors and were not promoted; and a Caucasian worker wore a swastika to work. In *Hafford v. Seidner*, 183 F.3d 506, the plaintiff employee (a prison guard) was called racially derogatory names by several fellow employees over a two and a half year period; repeatedly received anonymous and very threatening phone calls over the prison's internal telephone system, including one call stating "you're dead" and one using a slang phrase that referred to race-related lynching; and whose superior officer asked him if "he was scared to die." The totality of these circumstances, combined with other derogatory comments about being a "black Muslim," were sufficient to raise a jury

question as to the existence of a racially discriminatory hostile work environment. And see, *Pollard v. DuPont de Nemours, Inc.*, 412 F.3d 657, 659-664 (6th Cir. 2005), where a relentless, daily, consistent pattern of sexual harassment, including refusal to accept supervision from the plaintiff female supervisor, daily use of sexual slurs, altering machines to make plaintiff's job more difficult, and intentional "dirty tricks" such as slashing tires and burning plaintiff's food, were sufficient to support a jury verdict of a hostile work environment.

Moreover, Kelly failed to raise a genuine issue of disputed fact that the environment at the Center to which he objected unreasonably interfered with his ability to do his job. Kelly asserts that the environment was increasingly "hostile" but he does not recite any specifics of how that hostility interfered with his job duties. Kelly apparently passed his 90 day probation period under the Centers' personnel policy. There is no evidence suggesting that Kelly was not performing his job duties, performing them in substandard fashion, or prevented from doing his job, as a result of the comments, jokes and slurs he heard at the office.

We therefore affirm the district court's grant of summary judgment to defendants on Kelly's hostile work environment claim.

B.      Retaliation.

Kelly also alleged that his termination was in retaliation for his protected activity of complaining about the discriminatory atmosphere at Senior Centers. The district court found that Kelly established a prima facie case, and that Senior Centers had established a legitimate, nondiscriminatory reason for Kelly's termination. But the district court held that Kelly had not carried his burden of establishing a genuine issue of material fact concerning pretext.

(1) Prima Facie Case.

There is little dispute that Kelly satisfied three of the four requirements of a prima facie case. Kelly's opposition to the alleged discriminatory jokes and comments is a protected activity. Dangelo, Kelly's supervisor, knew of Kelly's objections to this behavior. Kelly was fired, an obviously adverse employment action. The fourth prong requires Kelly to show a causal connection between his protected activity and his termination. The district court found that Kelly's termination took place only eighteen days after Laurel Shoaff allegedly told Dangelo (in the March 1, 2002 exit interview) that Kelly and Pinney complained to her about the discriminatory atmosphere. Given the temporal proximity between the two events, and viewing the evidence in the light most favorable to Kelly, the district court found that the evidence sufficiently raised an inference of a causal connection.

As noted above, the record concerning the conversation between Shoaff and Dangelo is murky. Shoaff's affidavit of October 31, 2002, taken during the initial investigation of Kelly's complaint, states only that Shoaff told Dangelo of the racial and sexual discriminatory complaints in her April 3, 2002 written Monitoring Report. Shoaff signed an affidavit on March 30, 2004, stating she told Dangelo about Kelly's concerns in her exit interview for the site visit, which was more than a month before Shoaff's written report was issued. But then in a signed statement dated May 28, 2004, Shoaff contradicted her earlier affidavit, stating "Because of the amount of time that has transpired since my monitoring visit, as well as having had the opportunity to reflect further on the circumstances and events surrounding my visit, I cannot now say, with absolute certainty, that I, in fact, mentioned these concerns to Ms. Dangelo during this exit interview." (JA 323) Dangelo

denied that any such conversation took place. The Center's initial written response to the April monitoring report states that Shoaff's written comments about the alleged harassment were never discussed during Shoaff's visit, and came as a surprise to the Center. (JA 1209) Thus there is a real question about whether Dangelo knew that Kelly had complained to Shoaff or to CNCS when Dangelo terminated Kelly.

Kelly argues that this conversation is not the only evidence which shows a causal connection, relying on his own complaints to Dangelo about the racial and sexual harassment; Dangelo's statement to Pinney on the day she fired Kelly that Pinney should "watch her back" because Dangelo didn't trust her; and the insufficiency of the alleged insubordination as a reason for termination. Although the evidence is close, we find that Kelly's complaints to Dangelo, standing alone and if believed by the trier of fact, are sufficiently temporally related to his termination on March 19, 2002 to raise at least an inference that Dangelo fired Kelly because of his complaints to Dangelo. Therefore we conclude that the district court did not err in finding that Kelly established the elements of a prima facie case.

We also conclude, contrary to Kelly's argument, that the district court did not err in finding that the defendants established a legitimate, non-discriminatory reason for Kelly's termination. Kelly admitted that the first instance of insubordination, his confrontation with Ms. O'Neill in December 2001, involved yelling and perhaps cursing. An employee, Vicki Goetz, contemporaneously documented her concerns about Kelly's erratic behavior that day. More importantly, Kelly also admitted that the March 19 incident started when he interrupted a conversation between Dangelo and Richard Gee, that he insisted on "telling his story" even when

Dangelo told him not to interrupt, and that the confrontation again escalated into yelling and perhaps cursing. The Center's personnel policy plainly states that insubordination is grounds for immediate termination. The remaining question is whether Kelly proffered sufficient evidence of pretext to avoid summary judgment.

Pretext is established when plaintiff can show (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge. See *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Kelly argues here that the "totality of the circumstances" satisfies any or all these three prongs. Under the first and third *Manzer* prongs, the existence of discrimination may be inferred from all of the circumstances. Under the second method, Kelly cannot rely exclusively on his prima facie case, but must have additional evidence of discrimination. See *Manzer*, 29 F.3d at 1084-85.

(2) Pretext.

The district court correctly analyzed Kelly's claim under the *Manzer* rubric. Kelly did not deny that the two incidents of insubordination in fact occurred. He admitted that insubordination is a sufficient basis upon which an employee can be terminated. The district court specifically noted that Kelly had not shown that the defendants were inconsistent or contradictory in explaining their reasons for Kelly's termination. Kelly argues that his own version of the admitted events is more favorable to him than that of the defendants. However, in order to argue that the two incidents did not **actually** motivate his discharge, Kelly had to come forward with additional evidence of discrimination. This he failed to do.

-15-

Kelly suggests that Dangelo reacted "disproportionately" to his own conduct. Yet, there is nothing that raises even an inference that Dangelo treated other employees differently, or that she tolerated insubordination from other employees but not from Kelly. Similarly, Kelly's assertion that he did not yell as loudly as Dangelo claimed, or that Dangelo took his arm or may have put her hand on his shoulder when they walked down the hall to Kelly's office, do not suffice to create a **genuine** issue of disputed fact about Kelly's admitted insubordinate behavior. At best, I view the facts in the record as being in evidentiary equilibrium. Kelly's burden is to show that it is **more likely than not** that defendants' reasons are pretextual. Kelly's obvious disagreement with the Center's conclusion that he was insubordinate is not enough to satisfy the preponderance of the evidence burden of proof.

This conclusion is supported by this Court's recent decision in *White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232 (6th Cir. 2005). White sued her employer, the CMHA, after she was rejected for a promotion and the chosen applicant (Walker) was a male. White applied for the position of Manager of Safety and Crime Prevention, a job involving crime prevention and security responsibilities for all of CMHA's properties. White claimed that CMHA discriminated against her because she was a woman. Assuming White could establish a prima facie case, the Court held that CMHA established a legitimate, non-discriminatory reason for not hiring White, because Walker was more qualified. To establish pretext, White urged that all of the facts should be viewed to determine pretext under one or more of the *Manzer* factors. For instance, she alleged that a manager within CMHA wanted to hire a man, and set out to ensure that a man would be hired. White also alleged that CMHA accepted Walker's application after the deadline had passed; that CMHA ignored White's own application; that CMHA violated several of its own

-16-

personnel policies such as a stated preference for hiring internal candidates and an anti-nepotism policy violated by Walker's hiring; and that CMHA neglected to do a background check on Walker, which would have revealed a prior guilty plea to disorderly conduct. White also cited a comment by a member of the interview committee who explained to White why she was not interviewed for the job, that the hiring committee wanted a "grass roots guy" for the position. This Court found that, even if all of White's allegations were true, they would not establish that CMHA's legitimate reasons were a cover for a discriminatory motive. "The most White can show, in viewing the evidence in the light most favorable to her, is that her application was not given as much attention as she would have liked. However, she has not presented sufficient evidence for this court to conclude that the true reason behind the lack of attention is the fact that she is a woman." *Id.*, slip op. at 10. I reach the same conclusion about Mr. Kelly's complaints against the defendants.

This Court has often noted that we may not substitute our judgment for that of management in making personnel decisions. See, e.g., *Hedrick v. W. Reserve Care System*, 355 F.3d 444, 462 (6th Cir. 2004). Taking as true all of Kelly's allegations of racist and foul language tolerated by the Center's supervisory personnel, and his subjective justifications for his own behavior on the two occasions giving rise to his termination, they do not meet Kelly's burden of establishing a genuine factual dispute about the basis for his termination.

I would therefore affirm the judgment of the district court in all respects.

ROGERS, Circuit Judge. I respectfully disagree with part II. B. 2 of the lead opinion. The grant of summary judgment on plaintiff's retaliation claim should be reversed. Although, for the reasons given in the lead opinion the issue is close, Kelly has presented evidence tending to show that illegal motivation was more likely than the proffered legitimate motive. In addition to arguing that Kelly was not insubordinate (or that he was only a little insubordinate), Kelly proffers evidence that tends to show that Dangelo's proffered reason (insubordination) was pretext.

Circumstantial evidence demonstrates that Dangelo did not want employees complaining or criticizing her management style. As the lead opinion points out, "Kelly also claims that he wrote a memo to Dangelo, describing the objectionable racial comments, and that Dangelo refused to accept it, telling Kelly that 'we don't do memos here.' Dangelo allegedly told Kelly that he should follow the grievance policy if he was unhappy, but also told Kelly that she represents the Board in everything, that she 'handpicked her board and that they did what she asked them to do.'" The implication of this exchange is that Senior Centers does not want Kelly to complain, and Dangelo has set up the organization such that there can be no successful redress of grievances. Such evidence of Dangelo's practices or response to grievances is not an element of the prima facie case. This exchange lends some credence to Kelly's contention that Dangelo's true motivation was to quell criticism of racist activities at Senior Centers.

Moreover, Dangelo was hostile to Kelly after he complained of the racist jokes and statements. JA 227-30. This tends to show that Dangelo was motivated by her dislike for Kelly's complaints, which are protected conduct. Finally, Dangelo told another employee who engaged in similar protected conduct that she could not be trusted and that she should "watch [her] back." JA

267. That employee felt Dangelo's tone was threatening. This tends to show that Dangelo was motivated to discourage complaints about racist jokes and statements at Senior Centers.

Kelly needed only to present circumstantial evidence that could support a jury verdict that it is "'more likely than not' that the employer's explanation is a pretext." *Manzer*, 29 F.3d at 1084. It is true that this court in *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005), held that the plaintiff in that case did not present sufficient evidence for the court to conclude that the proffered reason was pretext. *White* arose in a somewhat different factual context. In *White* there appeared to be no evidence of that the proffered reason was pretext unlike the evidence–albeit limited–of hostility to Kelly's complaints in this case.

The judgment of the district court dismissing all Kelly's claims is accordingly **affirmed** regarding the hostile work environment claim (as stated in part C.1 of Judge Carr's 8/2/04 order) and **reversed** regarding the retaliatory discharge claim (as stated in part C.2 of Judge Carr's 8/2/04 order).

COLE, JR., Circuit Judge, dissenting. I would reverse the grant of summary judgment on both the retaliation and hostile work environment claims. Viewing the evidence in the light most favorable to the plaintiff and drawing all inferences in his favor, *see Eastman Kodak Co. v. Technical Servs., Inc.*, 504 U.S. 451, 456 (1992), the district court found that Kelly met many of the elements of a hostile work environment claim. Yet, according to the district court and today's majority, the conduct to which Kelly was avowedly exposed was not severe or pervasive. I respectfully disagree.

As alleged, the relevant conduct was severe; it was not, by contrast, simple teasing or offhand comment. *See Hafford v. Seider*, 183 F.3d 506, 512 (6th Cir. 1999). Several of Kelly's coworkers repeatedly referred to his clients as "niggers." A coworker routinely told racist jokes[1] and referred to Kelly's clients as, inter alia, "monkeys . . . [who] want their bananas." Kelly's supervisor laughed at racist jokes, referred to Kelly's clients as "pigs," and referred to her one superior of color as a "brainless . . . token black." At a Christmas party, this supervisor told Kelly that his clients—poor, elderly people of color—were "loaded with bugs" and, because they "liked to hug," he should shake out his clothing when he got home. As a result of this and other conduct, Kelly averred that he felt increasing isolated, had difficulty concentrating, and was reluctant to ask questions. When he complained, Kelly was berated, physically shoved, and ultimately terminated.

Nothing about such conduct is offhand. *See Jackson v. Quanex*, 191 F.3d 647, 662 (6th Cir. 1999) ("[A]n abundance of racial epithets and racially offensive graffiti can hardly qualify as

---

[1] For instance, Kelly's coworker asked him, "what two syllable word do whites hate to hear associated with blacks?" The answer: "Neighbor."

offhand or isolated."). The race-based ridicule and bestialization of the Center's clients is more than simple teasing. *See id.* ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."). *Cf. Virginia v. Black*, 538 U.S. 343, 388 (2003) (Thomas, J., dissenting) ("In every culture, certain things acquire meaning well beyond what outsiders can comprehend.").

Although inessential to a hostile work environment claim, *see Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (requiring the conduct to be "severe *or* pervasive") (emphasis added), the conduct at issue was also pervasive. Kelly served in his position for only four months. Over the course of less than eighty business days—discounting the five national holidays that take place between November 14, 2001 and March 19, 2002—Kelly reports more than a dozen instances of offensive conduct, culminating in a physical confrontation. According to the lead opinion, the record precludes a finding that Kelly faced offensive conduct on a weekly basis. I believe that the record compels such a finding.

The standard is not whether the conduct Kelly has alleged was as egregious as the conduct at issue in prior opinions of this Circuit.[2] The standard, as articulated by the Supreme Court, is whether the alleged conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Id.* I have no doubt that a reasonable jury could find that the alleged conduct meets this standard. I would therefore reverse

---

[2]That said, for a meritorious hostile work environment claim on analogous facts, see *Moore v. Kuka Welding System & Robot Corp.*, 171 F.3d 1073 (6th Cir. 1999).

-21-

No. 04-4094
*Kelly v. Senior Ctrs., Inc.*

the district court's grant of summary judgment in favor of the defendant and remand the case for trial

on both the retaliation and hostile work environment claims.