NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0749n.06
Filed: October 19, 2007

No. 06-4324

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DEAUDREY LOVELACE and AUDRA PICCIANO,     )
                                          )    ON APPEAL FROM THE
       Plaintiffs-Appellants,             )    UNITED STATES DISTRICT
                                          )    C O U R T   F O R   T H E
              v.                          )    NORTHERN DISTRICT OF
                                          )    OHIO
BP PRODUCTS NORTH AMERICA, INC.,          )
                                          )
       Defendant-Appellee.                )

_____

BEFORE:  GILMAN and GRIFFIN, Circuit Judges; and ACKERMAN, District Judge.[*]

       GRIFFIN, Circuit Judge.

       Plaintiffs Deaudrey Lovelace and Audra Picciano appeal from the district court's order

granting summary judgment in favor of defendant BP Products North America, Inc. ("BP"), in this

case alleging retaliation and a racially hostile work environment in violation of Title VII of the Civil

Rights Act (42 U.S.C. §§ 2000e-2000e-17), 42 U.S.C. § 1981, and OHIO REV. CODE § 4112.  For

the reasons stated below, we affirm the judgment of the district court dismissing all claims.

                                          I.

       BP is a global energy company that operates fuel stations throughout the United States.  BP

owns and operates a retail store in Strongsville, Ohio, which consists of a gas station and a connected

_____

       [*]The Honorable Harold A. Ackerman, Senior United States District Judge for the District of
New Jersey, sitting by designation.

Subway sandwich shop. Plaintiffs Lovelace, an African-American woman, and Picciano, a Caucasian woman, were hired by BP in June 2003 and January 2004, respectively, as customer service representatives ("CSRs"). They staffed both the gas station and the sandwich shop, attended to customers, stocked shelves, made sandwiches, and cleaned the premises. The Strongsville store was managed by Chris Cordeiro, who succeeded Julie Bruno as General Manager in October 2004. Kim Tasse, the Subway manager hired in January 2005, reported directly to Cordeiro who, in turn, reported to Melody Sheffield, BP's account executive. Linda McCrae worked for BP as a human resources advisor, providing training and advice to store managers charged with enforcing BP's employment policies. Sheffield and McCrae were responsible for multiple stores and thus did not work on site at the Strongsville store. Decisions regarding employee discipline rested with management at the Strongsville store – in this case, Cordeiro and Tasse.

BP maintains an employee manual that addresses, among other topics, policies and procedures designed to prevent unlawful discrimination and harassment. The manual is distributed to all new employees and a copy was kept at the Strongsville store so that it would be accessible to all employees. Pursuant to the manual, an employee who believes that he or she has been subjected to unlawful harassment or discrimination must immediately report the incident to management personnel. The manual directs management to investigate promptly a complaint, meet with the complainant and offending party, and, if necessary, take immediate remedial or disciplinary action. BP's policies also provide that an employee who makes a false complaint of discrimination will be subject to disciplinary action, including possible termination of employment.

The allegations that form the basis of this lawsuit began during Bruno's management in October 2004, when Bruno told Lovelace that she should wear a hairnet because of customer complaints about hair in Subway's food. Lovelace took offense because Bruno did not ask any other CSRs to wear a hairnet. During this same time period, Lisa Abboud, a CSR of Lebanese descent, told Lovelace that her toddler son had never seen a black person and that her husband had once seen an African-American woman, and he had commented that the woman was "pretty to be so dark." Although Lovelace was offended, she did not report this incident. Abboud offended Lovelace again when she disparaged homosexuals; Lovelace, a heterosexual, filed an incident report, but no response was forthcoming from management.

In October 2004, Abboud commented to Picciano that black people "smelled funny." Picciano found the statement to be offensive, informed Bruno and Lovelace about the comment, and filed an incident report. Picciano alleges that she never received a response regarding this written complaint.

Within weeks of Abboud's statement, Safety Coordinator Dawn Smith, who has a prosthetic leg, heard Abboud make disparaging remarks about disabled people. Smith took offense and prepared an incident report, in which she noted that she was handicapped, and gave it to Cordeiro. However, Smith never received a response from Cordeiro regarding her complaint.

On April 5, 2005, Abboud, in the presence of Picciano, allegedly referred to an African-American customer leaving the store as a "dumb nigger." No other employees heard the alleged comment. Picciano reported the incident to Tasse and Cordeiro. Cordeiro immediately confronted

Abboud, who admitted saying something about the customer, but denied using a racial epithet. Cordeiro then advised Tasse to further investigate the matter by reviewing the tape from the store's surveillance cameras, but the tape was not helpful because of a malfunctioning audio system. Tasse convened a meeting with Picciano and Abboud, informed them that the tapes were inconclusive, and urged the two women to "talk the issue out." Although Abboud denied using a racial epithet, she apologized for saying anything that may have offended Picciano, but added that Picciano should not have been offended because she was not black. Picciano refused to accept Abboud's apology. Tasse then instructed Picciano and Abboud to go back to work and stated that she would talk further to Cordeiro about the incident. Cordeiro considered the matter closed and did not forward the report to BP's Human Resources Department.

Picciano told Lovelace, who was not at work on April 5, about the incident. On April 12, 2005, Lovelace confronted Abboud, and the discussion deteriorated into an exchange of profanities. Thereafter, the animosity between Abboud and plaintiffs escalated into a series of verbal skirmishes. On April 12, 2005, Lovelace filed an incident report regarding the April 5 incident, even though she had not witnessed it and had no new information about it. On April 14, Picciano talked to Cordeiro again about the April 5 incident and reviewed the surveillance tapes with him. She agreed that the tapes could not corroborate her allegations. The next day, Cordeiro contacted Linda McCrae in the human resources department to make her aware of the complaint. McCrae stated that she would reinvestigate the matter. On April 18 and 19, Lovelace complained to Tasse about Abboud's

rudeness. On April 23, Lovelace submitted another incident report to Cordeiro, complaining again about the April 5 incident. This report contained no new information or allegations.

Meanwhile, in the course of her investigation, Linda McCrae interviewed Picciano and Abboud on April 25, 2005, and Lovelace the next day. She concluded that the April 5 incident could not be confirmed, but recommended that Cordeiro issue a written warning to Abboud. Cordeiro, however, declined to issue a warning to Abboud because of a lack of evidence. After her discussion with Linda McCrae, Lovelace angrily approached Tasse and protested to her that "I am a nigger, so nothing is going to happen. No one cares because I'm a nigger." As a result of this outburst, Lovelace was issued a written reprimand instructing her not to use racist terminology in the workplace.

On April 29, 2005, Melody Sheffield visited the Strongsville store and was approached by Lovelace for a discussion of the April 5 incident. Sheffield assured Lovelace that BP did not tolerate harassment and that there would be a review of the anti-harassment policy with all BP employees at the Strongsville store. One week later, the anti-harassment policy was redistributed to all Strongsville employees, who were required to review and sign it. Sheffield also advised Lovelace that if she could not work with Abboud, BP would be willing to transfer her to another store, but Lovelace declined the offer.

As chronicled in the district court's Opinion and Order, *Lovelace v. BP Products North America, Inc.*, Docket No. 1:05-cv-2203, 2006 WL 2583415, at *2-3 (N.D. Ohio, Sept. 6, 2006), the feud nonetheless continued throughout May of 2005. Tasse and Cordeiro intervened and were

uniform in their advice to plaintiffs to move forward, transfer to another store, or quit. By the end of May, Cordeiro had received numerous complaints from plaintiffs' coworkers, who were annoyed by not only plaintiffs' constant disruptive and divisive discussions about the April 5 incident, but also the fact that plaintiffs had drawn them into the fray, called them "racist," and filed incident reports against them for refusing to cooperate in their campaign against Abboud. Cordeiro again warned plaintiffs that if they elected to stay at the Strongsville BP and continued to disrupt business, they would be terminated. Undeterred by the warning, plaintiffs and Abboud clashed again, and plaintiffs filed more incident reports. All in all, plaintiffs generated a total of seventeen incident reports after October 2004, many of them pertaining to the April 5 incident.

Upon their arrival at work on the morning of May 27, 2005, Picciano and Abboud engaged in one final heated argument, during which Abboud allegedly called Picciano a "rude bitch." Lovelace claims to have been standing next to Picciano and to have "heard the whole thing." Plaintiffs also heard a Hispanic coworker, apparently out of exasperation at the situation, jokingly refer to himself as a "spic." Predictably, plaintiffs then spent the beginning of their work shift filling out multiple incident reports about these comments, instead of working.[1] The amount of time it took to do so is disputed by the parties. In any event, when Cordeiro arrived, he was greeted by plaintiffs and the incident reports. Cordeiro promptly spoke with Abboud, who admitted telling Picciano that she "was really rude" to barge through the door to the Subway shop, but denied using profanity or

---

[1]The number of incident reports filed on May 27 is in dispute. Tasse testified that plaintiffs filed seven incident reports that morning; plaintiffs contend that they filed only three.

a racial slur. Cordeiro and Tasse watched and listened to the surveillance tapes of the incident. According to Cordeiro, the tapes indicated that plaintiffs had filed a false claim and that Abboud had not called Picciano a "bitch."

Cordeiro and Tasse called plaintiffs into the store office, informed them that they were disrupting the workplace, and sent them home. Plaintiffs claim that Tasse told them they no longer had jobs, but Tasse and Cordeiro dispute this, testifying that plaintiffs were sent home for the day and would be contacted regarding their next scheduled shift. Plaintiffs allege that on their way out of the store, Abboud called Picciano a "nigger lover."

Later that same day, Tasse left a phone message for Picciano, stating that she was calling to talk to Picciano about her work schedule. Tasse also attempted to contact Lovelace, but her phone was temporarily disconnected. In any event, Lovelace went to Picciano's house later that day and listened to the phone message from Tasse. Plaintiffs did not contact BP. When the Strongsville store posted its work schedule for the next week, plaintiffs were not listed on it.

On June 15, 2005, Cordeiro wrote letters to plaintiffs, instructing them to contact him on or before June 23, 2005, to be placed back on the work schedule. The letter advised plaintiffs that if they did not contact Cordeiro by June 23, BP would consider their jobs to have been abandoned. Plaintiffs received the letters, but did not respond. As a result, plaintiffs' employment was terminated.[2]

---

[2]Plaintiffs dispute the timing of their job termination, alleging that they were fired on the morning of May 27, 2005; Tasse supplied yet another version of events, recalling that plaintiffs lost their jobs when they failed to show up for work as scheduled after the May 27 incident.

Plaintiffs requested and received a right-to-sue letter from the EEOC and, on August 19, 2005, filed a nine-count complaint in the Ohio state court. In the complaint, plaintiffs alleged a racially hostile work environment and retaliation in violation of Title VII, 42 U.S.C. § 2000e-2000e-17, and OHIO REV. CODE § 4112. Lovelace alone alleged a claim of racial harassment and retaliation under 42 U.S.C. § 1981. Defendant removed the case to federal district court pursuant to 28 U.S.C. §§ 1331 and 1441(b) and, following the completion of discovery, moved for summary judgment under Federal Rule of Civil Procedure 56(c).

The district court granted defendant's motion and dismissed the case in its entirety, concluding in pertinent part that plaintiffs failed to establish a prima facie case of either a racially hostile work environment or retaliation under federal or state law. *See Lovelace*, 2006 WL 2583415 at *5-8. Plaintiffs now appeal the judgment entered in favor of BP.

II.

We review a district court's grant of summary judgment de novo. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). This court must view all the facts and the inferences drawn from them in the light most favorable to the nonmoving party. *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Thus, only disputed material facts, those "that might affect the outcome of the suit under the governing law," will forestall summary judgment. *Id*. at 248.

III.

With regard to their allegations of a racially hostile work environment, plaintiffs contend that the district court erred in granting summary judgment because they have demonstrated sufficiently that from the period of late 2004 until May 27, 2005, they were subjected to a continuous stream of racially derogatory comments by coworkers that were so pervasive or severe as to create an objectively hostile workplace. We disagree.

Title VII of the Civil Rights Act of 1964 renders it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1). The protections of Title VII extend to a hostile workplace environment in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). The requisite standard includes both objective and subjective elements. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively

perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21-22. *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("[C]onduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.") (citation and quotation marks omitted).

Under the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), plaintiffs must initially establish a prima facie case of a racially hostile work environment based on coworkers' conduct by showing that: (1) they are members of a protected class; (2) they were subjected to unwelcome racial harassment; (3) the harassment complained of was based on race; (4) the harassment unreasonably interfered with the employees' work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable for the creation of that environment. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).[3] We have recognized that "in order to state a cognizable claim under Title VII, the plaintiff himself need not be a member of a recognized protected class; he need only allege that he was discriminated on the basis of his association with a member of a recognized protected class." *Johnson*, 215 F.3d at 574.

---

[3]The same evidentiary standards used to evaluate a Title VII hostile work environment claim also apply to plaintiffs' claims under the relevant analogous Ohio statute, OHIO REV. CODE § 4112, and 42 U.S.C. § 1981. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000).

The alleged harassment must be evaluated based on the totality of the circumstances. *Harris*, 510 U.S. at 23; *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Thus, the court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offense utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23; *see also Williams*, 187 F.3d at 560-62 (adopting the *Harris* standard). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment. . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Consequently, "simple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id*. (internal citation and quotation marks omitted). "[A] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single episode crosses the Title VII threshold." *Williams*, 187 F.3d at 564.

Here, we agree with the district court that the numerous discrete incidents of alleged harassment which form the crux of plaintiffs' claim,[4] considered in totality, did not create a workplace atmosphere that was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787.

---

[4]*See* the district court's opinion and order citing twelve distinct complained-of events. *Lovelace*, 2006 WL 2583415 at *5.

Abboud's alleged comments, taken as true, are certainly in poor taste and offensive. Abboud, however, denied using the N-word on April 5, the principal event that sparked plaintiffs' ire and generated a rash of redundant incident reports. BP promptly investigated the April 5 occurrence, but surveillance tapes were inconclusive, and there was no third-party corroboration of plaintiffs' version of events. The remainder of the race-based comments in this case were not directed at plaintiffs,[5] and, after the April 5 incident, the instances in which coworkers used derogatory racial terms now objected to by plaintiffs occurred in the context of discussions, instigated by plaintiffs, about the April 5 incident.

Moreover, several of the allegations are unrelated to racial hostility and thus are not relevant to plaintiffs' race-based hostile work environment claims. *See Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 358 (5th Cir. 1995) ("[W]e find a tenuous relationship here between discrimination that could be reflected in [the plaintiff's supervisor's] derogatory remarks about race, sex, and national origin and discrimination based on *handicap*, which is the focus of [the plaintiff's] complaint."). Here, plaintiffs' complaints that Tasse asked Lovelace to remake a sandwich, Cordeiro gave them the cold shoulder, Abboud called Picciano a "stupid bitch," and Abboud disparaged disabled people, do not have a direct bearing on the central claim of racial animus. Plaintiffs offer only their subjective beliefs that these incidents were racially motivated and interfered with their work. Such subjective and conclusory allegations are insufficient to create a genuine issue of

---

[5]Plaintiffs testified that Abboud's remarks were directed at "everybody," regardless of race, gender, or ethnicity.

material fact regarding whether the work environment was racially hostile in violation of Title VII as defined by *Harris*.

Finally, the evidence is unmistakably clear that plaintiffs unnecessarily fanned the flames of discontent, seeking to enlist other coworkers in their feud with Abboud, and escalating the tension by taking the slightest offense at innocuous comments, gestures, or looks made by Abboud and fellow employees. In short, plaintiffs wore out their welcome in the small confines of the store, alienating their coworkers who, initially sympathetic, soon became the subjects of incident reports themselves. The Supreme Court in *Harris*, discussing the boundaries of actionable conduct, noted that "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris*, 510 U.S. at 22. Ironically, in this case, it was the harried BP managers who were most likely to suffer a nervous breakdown while caught in the crossfire of this verbal warfare.

In sum, we conclude that the present circumstances are comparable to those cases in which we have found workplace conduct to be "merely offensive" but not sufficiently severe or pervasive to be cognizable under Title VII. *Harris*, 510 U.S. at 21. For instance, in *Kelly v. Senior Ctrs., Inc.*, 169 F. App'x 423 (6th Cir. 2006), we held that the plaintiff failed to allege facts sufficient to meet the *Harris* threshold where staff members used the pejorative N-word in referring to participants in a program that plaintiff supervised; an executive described a board member as a "token black," commented that the participants were slovenly or were "pigs" at meals, and tolerated others' racist behavior; another coworker made three racist jokes; and rude comments were made about African-American staff members' bathroom habits. We noted that "[w]hile these incidents are deplorable

and offensive, they do not amount to a pervasive, aggressive, or constant course of conduct." *Kelly*, 169 F. App'x at 429. *See also Bowman*, 220 F.3d at 464 (holding that five incidents of racial harassment did not constitute severe or pervasive conduct); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760-61 (6th Cir. 2000) (incidents including one racial slur directed at plaintiff, racially offensive and obscene cartoon circulated in workplace, and African-American employee referred to as a "gorilla" were deemed not severe or pervasive enough to constitute objectively hostile work environment); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir. 1997) (holding that plaintiffs failed to show existence of an objectively hostile work environment where most of the alleged discriminatory remarks were not directed at the plaintiff and "[a]lthough the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was 'not designed to purge the workplace of vulgarity.'") (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

Contrary to plaintiffs' contention, the present circumstances are not remotely analogous to the indignities suffered by the plaintiff in *Jackson*. The pervasive racist conduct at issue in *Jackson* included incidents where the plaintiff's supervisors routinely used the N-word and other racial epithets, graffiti stating the "KKK is back" and depicting a lynching was found in restrooms, award stickers were given out for the firing of minority workers, a minority worker's T-shirt was defaced with a racial slur, African-Americans were disproportionately disciplined and not promoted, a Caucasian worker wore a swastika to work, and an African-American worker was falsely accused by Caucasian workers of stealing money in an attempt to fire the minority worker. In this setting,

we reversed the judgment of the district court in favor of the defendant employer and remanded for a new trial on the plaintiff's racially hostile work environment claims, noting that "an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhand or isolated. Rather, such continuous conduct may constitute severe and pervasive harassment." *Jackson,* 191 F.3d at 662; *see also Hafford*, 183 F.3d at 513-15 (holding that there was sufficient evidence to warrant jury consideration of hostile work environment claim where the plaintiff prison guard was racially harassed over a more than two-year period by coworkers and received anonymous threatening phone calls over the prison's internal telephone system).

We also agree with the district court that BP responded reasonably and appropriately to plaintiffs' complaints. In advancing a hostile work environment claim, "[t]he plaintiff must also prove that his employer tolerated or condoned the situation, or knew or should have known of the alleged conduct and did nothing to correct the situation." *Smith*, 220 F.3d at 760 (internal citation and quotation marks omitted). "Courts may hold an employer directly . . . liable for co-worker harassment if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Jackson*, 191 F.3d at 659 (citation and quotation marks omitted). Here, the central April 5 incident was twice investigated in a timely manner, with both Tasse and McCrae reaching the same conclusion: that there was insufficient corroborative evidence to pursue disciplinary action against Abboud. In May 2005, following other alleged incidents, BP reviewed its anti-harassment policy with all of its employees at the Strongsville store. Cordeiro and Tasse each offered plaintiffs the opportunity to laterally transfer to another store location and

unsuccessfully attempted to mediate a truce between plaintiffs and Abboud. Under the circumstances, these were reasonable measures taken by BP to correct the alleged workplace harassment by plaintiffs' coworkers.

We therefore conclude that the district court did not err in granting summary judgment to BP in light of plaintiffs' failure to establish a prima facie hostile work environment claim pursuant to Title VII, 42 U.S.C. § 1981, and OHIO REV. CODE § 4112.

IV.

Finally, with regard to plaintiffs' Title VII retaliation claims, we affirm summary judgment in favor of BP for the reasons set forth by the district court in its opinion and order.[6] As the district court correctly concluded, plaintiffs have not made the requisite showing that there was a causal connection between the protected activity of filing incident reports about alleged harassment and their termination. *Johnson*, 215 F.3d at 578. BP proffered undisputed evidence that plaintiffs' termination was warranted by their unreasonable disruptive behavior in the workplace. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989) ("An employee is not protected [by Title VII] when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals.").

V.

For the foregoing reasons, the district court's judgment in favor of BP is affirmed.

---

[6]*See Lovelace*, 2006 WL 2583415 at *6-8.