# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 26, 2010 Session

## ERIC BOONE ET AL. V. CITY OF LAVERGNE, TENNESSEE, ET AL.

### Appeal from the Chancery Court for Rutherford County
### No. 08-0803CV     Robert E. Corlew III, Chancellor

---

### No. M2010-00052-COA-R3-CV - Filed February 16, 2011

---

Two former employees of the City of LaVergne claimed that the defendants retaliated against them in violation of the Tennessee Human Rights Act for complaining of race discrimination in the workplace and for filing claims with the EEOC. One of the plaintiffs asserted an additional claim for hostile work environment discrimination. The jury returned a verdict for both plaintiffs for retaliation and for hostile work environment for one plaintiff. The defendants appeal the trial court's admission of certain testimony and evidence about an alleged listening device as well as the jury verdict for hostile work environment and the amount of damages for humiliation and embarrassment. We find that the trial court erred in admitting the testimony, but that the error was harmless. The court did not err in admitting evidence about the alleged listening device. We conclude that there is material evidence to support the jury verdict's for a hostile work environment as well as the amount of the award for damages.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Jeffrey Michael Cranford and William Nelson Bates, Nashville, Tennessee, for the appellants, City of LaVergne, Tennessee and LaVergne Sewer Department.

Kerry Knox and Thomas H. Castelli, Murfreesboro, Tennessee, for the appellees, Eric Boone and Anthony Corder.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs, Eric Boone and Anthony Corder, were employees of the City of LaVergne in the Sewer Department. Corder, an African-American, claims that he was exposed to various acts of racial harassment that created a hostile work environment, including racial jokes and comments by co-workers. Boone, Corder's partner at the Sewer Department, allegedly witnessed these acts.

Corder first complained about the work environment to the department supervisor, Johnny James, around July 2007. Around February 26, 2008, the plaintiffs again complained to James, as well as Bob Burns, the City's Public Works Director. The plaintiffs met with Kathi Payne, Director of Human Resources, on February 26, 2008, to voice their concerns about racial discrimination and the work environment. On February 29, 2008, the plaintiffs filed charges against the City and the Department with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, hostile work environment, and retaliation.

The plaintiffs alleged that, following their complaints, the City retaliated against them, eventually causing Corder's resignation and Boone's administrative termination. The alleged retaliation occurred on several different occasions, including the following:

- Following the plaintiffs' meeting with Payne, the supervisor of the Department, Johnny James, informed the plaintiffs that their work schedule would have to be revised to comply with the standard schedule.[1]

- The plaintiffs claim that, after filing charges with the EEOC, they were ostracized by their co-workers. Corder alleges that one co-worker, Kenny Baltimore, approached him in a storage room and harassed him. That same day, the plaintiffs allege, a truck driven by Baltimore's step-son, which bore a Confederate flag bandana, drove by their workplace. After the plaintiffs filed a police report about the incident, they were arrested for filing a false report. Corder testified that the plaintiffs were booked, searched, and had hand prints and mug shots taken.[2]

---

[1] The plaintiffs had previously been working different hours from other employees in their department in order to take their children to school and child care.

[2] According to the plaintiffs, the criminal warrants were dismissed as not being supported by
(continued...)

- On May 21, 2008, James filed a police report of vandalism against the plaintiffs for an incident that occurred at a customer's home. Wires connected to an alarm that is triggered when the water level is too high had been cut to stop the alarm from sounding, and the customer's home flooded. The plaintiffs had been on two service calls to the residence. No charges were brought against the plaintiffs.

- In May 2008, the plaintiffs were given a different City truck to drive because the truck of one of their co-workers broke down. The plaintiffs claim that the truck they were given was unreliable and frequently broke down. In June 2008, the plaintiffs discovered what they believe to be a recording device in their City vehicle.

The defendants claimed that they did not discriminate against the plaintiffs and had legitimate, non-discriminatory reasons for the actions taken.

The plaintiffs filed suit on June 6, 2008, alleging claims for hostile work environment and retaliation pursuant to the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq*. They filed amended complaints on June 23, 2008, August 19, 2008, November 26, 2008, and June 11, 2009. The defendants filed a motion for summary judgment on July 17, 2009, which was denied by the court.

The matter proceeded to a trial by jury, which was conducted on August 24, 25, 26, 31, and September 1, 2009. The jury returned a verdict in favor of each plaintiff in the amount of $300,000 for retaliation. The jury also awarded Corder $50,000 for his hostile work environment claim.

The City's motion for a new trial or, in the alternative, a remittitur of the compensatory damages was denied. The defendants filed this appeal.

STANDARD OF REVIEW

Findings of fact by a jury in civil actions will be set aside only if there is no material evidence to support the verdict. Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

---

[2](...continued)
probable cause.

ANALYSIS

The defendants raise the following issues[3] on appeal:

- Whether the trial court erred in allowing testimony regarding statements made by Kenny Baltimore to Kathi Payne about Corder.

- Whether the trial court erred in allowing the testimony of Tony Hiles.

- Whether the trial court erred in allowing evidence about the purported listening device found by the plaintiffs.

- Whether the jury verdict in favor of Corder's claim of hostile work environment is contrary to the weight of the evidence.

- Whether the verdict for compensatory damages is reasonable.

Testimony about Baltimore's Statements to Payne

We review a trial court's decision regarding the admission or exclusion of evidence under an abuse of discretion standard. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005); *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). Under this standard, we are required to uphold the trial court's ruling "as long as reasonable minds could disagree about its correctness." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). So, "we are not permitted to substitute our judgment for that of the trial court." *Id*. An appellate court "will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). We review a trial court's discretionary decision to determine: "(1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives." *Id*.

We begin by examining the testimony that was allowed by the trial court. On October 29, 2008, Corder called Kathi Payne and stated that he would be coming by her office. Corder had been off work on medical leave, and Payne assumed that he was coming in to resume his employment. Payne testified that normally she "would have called the department

---

[3] At oral argument, the defendants stated that they waived another issue—whether the jury verdict in favor of the plaintiffs' claim of retaliation is contrary to the weight of the evidence.

head or his supervisor or any supervisor over the public works," but the department heads for the sewer, water, and street departments were out of the office. Therefore, Payne called Kenny Baltimore, the plaintiffs' co-worker, to notify him that Corder was returning to work. At trial, Payne testified that Baltimore responded, "If he comes back here and starts anything, I'll kill that nigger."

Prior to trial, the defendants moved to exclude all testimony related to Baltimore's alleged statement pursuant to Rules 403, 602, and 802 of the Tennessee Rules of Evidence. However, the court ruled that the evidence was admissible. On appeal, the defendants claim that the statement should have been excluded on three grounds: (1) it was irrelevant under Tenn. R. Evid. 402; (2) it was unfairly prejudicial under Tenn. R. Evid. 403; and (3) it was inadmissible hearsay under Tenn. R. Evid. 802.

The defendants first argue that because Corder did not know about Baltimore's statement until after his employment with the defendants ended, it is not relevant to determining whether Corder's work environment was hostile.[4] Corder testified that he was not aware of Baltimore's statement until January 20, 2009, when Payne was deposed, which was after Corder's employment with the City had ended. The defendants cite *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008), in support of their position that Corder must have been aware of the statement during the course of his employment for it to be admissible. The defendants are correct. The Sixth Circuit has made clear that because claims based on a hostile work environment must be evaluated by both an objective and subjective standard, evidence of a hostile work environment of which the plaintiff is unaware is not relevant. *Armstrong v. Whirlpool Corp.*, No. 08-6376, 2010 WL 273691, at *10 (6th Cir. Jan. 26, 2010) (concluding that the trial court properly excluded evidence of which the plaintiffs were unaware "because this court has stated on numerous occasions that such evidence is not relevant to a plaintiff's hostile work environment claim"); *Barrett v.*

---

[4] Corder contends that the defendants have raised "a pure relevancy objection" for the first time on appeal because Rule 402 was not raised in either a motion in limine or at trial. As a result, Corder insists that the defendants have waived this objection. We disagree. The defendants' pre-trial motion in limine did address "the admissibility of evidence of a hostile work environment to which the complaining employee was not exposed or which occurred outside of his presence." The defendants discussed cases where evidence was discovered only "after the initiation of litigation." In their motion in limine, the defendants cited a case where a plaintiff, who was unaware of sexual harassment at work while it was ongoing, failed to prove that the environment was hostile to her. *See Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001). The defendants' argument on appeal is substantially the same as their motion in limine: the evidence the defendants hoped to exclude "may be evidence of racial animus, but it does not rise to the level of hostile environment because it did not happen in the Plaintiff's work environment, if at all." Additionally, the defendants renewed their objections regarding Baltimore's statement at trial, specifically noting that they were preserving the issue for appeal.

*Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (holding that "comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile"); *Hawkins*, 556 F.3d at 335 (stating that case law "makes clear that we can consider evidence of other acts of harassment *of which a plaintiff becomes aware during the period [of] his or her employment*, even if the other acts were directed at others and occurred outside the plaintiff's presence" (emphasis added)); *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (noting that the court may consider other acts of harassment only if they are "directed to, and with the knowledge" of the plaintiff); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 249 n.4 (6th Cir. 1998) (stating that certain evidence was irrelevant to plaintiff's hostile environment claim "because there is no evidence that plaintiff was aware of these actions at the time"). We therefore conclude that the trial court erred in admitting testimony of Baltimore's statement to Payne.

Tenn. R. App. P. 36(b) governs the effect of trial error: "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Thus, we must determine whether the admission of Baltimore's statement more probably than not affected the jury's finding of a hostile work environment.

A plaintiff must demonstrate the following to establish a prima facie case of a racially hostile work environment:

> (1) the plaintiff was a member of a protected class; (2) the plaintiff was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable.

*Armstrong*, 2010 WL 273691, at *6 (citing *Barrett*, 556 F.3d at 515). The trier of fact must consider the totality of the circumstances in determining whether a hostile work environment existed. *Id.* The conduct must be "sufficiently severe or pervasive to 'alter the conditions of (the victim's) employment and create an abusive working environment.'" *Id.* (citing *Jackson v. Quanex*, 191 F.3d 647, 658 (6th Cir. 1999) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986))).

The defendants contend that the admission of Baltimore's statement was not harmless and request that the judgment of the trial court be set aside. We see nothing in the record to indicate that, absent the testimony about Baltimore's statement, the judgment "more probably than not" would have been different. *See* Tenn. R. App. P. 36(b). There is other evidence

in the record of a hostile work environment. The jury heard testimony about the following incidents that allegedly occurred during Corder's employment with the City:

- Baltimore told Corder "you must not realize what color you are" in response to Corder's statement that he was going to run for mayor in the next election.

- One employee asked another if she could believe that "blacks [were] allowed to vote before women."

- One employee, Teresa Barrett, told another, Danny Victory, that "she didn't think it was right that we get off on some black person day and we don't even get off on President's Day."

- Employees watched a Dave Chappelle video skit about a blind African-American who is a member of the Ku Klux Klan and quoted lines from the skit thereafter, including "kill the niggers."

- One employee told an African-American employee "Happy James Earl Ray Day" on Martin Luther King, Jr. Day.

It was up to the jury to decide whether these incidents cumulatively rose to the level of harassment that unreasonably interfered with Corder's work performance by creating an intimidating, hostile, or offensive work environment for which the City was liable. *See Armstrong*, 210 WL 273691, at *6. There was sufficient evidence for the jury to reach such a conclusion without testimony about Baltimore's alleged statement. The existence of this evidence distinguishes the instant case from those cited by the defendants. *See State v. Ford*, 861 S.W.2d 846, 850 (Tenn. Crim. App. 1992) (stating that the only incriminating evidence, besides that erroneously admitted, came from the victim himself and a physician who concluded that the injury could have a number of causes); *Moon v. SCOA Industries, Inc.*, 764 S.W.2d 550, 554-55 (Tenn. Ct. App. 1988) (noting that, aside from the erroneously admitted evidence, the "plaintiff's proof was quite thin in establishing the negligence of defendant and required a finder of fact to rely upon, for the most part, inferences to be deduced from the circumstantial evidence").

We hold that although the trial court's admission of Baltimore's statement was error, a consideration of the whole record does not show that this error more probably than not affected the judgment or resulted in prejudice to the judicial process, and therefore, it was harmless error. *See* Tenn. R. App. P. 36(b).

## Testimony of Hiles

The defendants claim that the testimony of Tony Hiles should have been excluded by the trial court because it was not relevant to the plaintiffs' claims and its only value was to inflame the jury. Hiles was a former employee of the City who testified that he heard "very regular" racial comments in the workplace. He testified that Baltimore told him, "I hate a smart-ass nigger," and "[Corder's] just a stupid nigger." He further described Baltimore's demeanor in the workplace as "very antagonistic" and stated that "he stayed angry a lot at people."

The defendants repeat their previous argument that Hiles's testimony "is only relevant if the Plaintiff became aware of it during the time he was employed by the Defendant." Corder fails to point to any proof in the record that he was aware of Baltimore's statements to Hiles during his employment. The Sixth Circuit has excluded evidence of a plaintiff's hostile work environment claim "because there is no evidence that plaintiff was aware of these actions at the time." *Abeita*, 159 F.3d at 249 n.4. Absent any evidence that Corder was aware of the statement during his employment, we conclude that the trial court erred in admitting Hiles's testimony.

We must determine whether the admission of Hiles's testimony more probably than not affected the jury's finding of a hostile work environment. As discussed above, aside from Payne's and Hiles's testimony about Baltimore's comments, there was additional testimony about instances of racial comments and joking at the Department which could have led a jury to conclude that the harassment unreasonably interfered with Corder's work performance by creating an intimidating, hostile, or offensive work environment. We therefore cannot conclude that the admission of Hiles's testimony more probably than not affected the judgment.

## Evidence about the Alleged Listening Device

The defendants claim that the trial court erred in allowing evidence regarding the alleged listening device that was found by the plaintiffs.[5] The object, a small, round electronic device, was discovered by Boone as he reached up to adjust the rearview mirror in the plaintiffs' work truck in June 2008. The defendants insist that the plaintiffs had no

---

[5] The defendants' argument about the alleged listening device appears in the part of their appellate brief contesting the jury's verdict on the plaintiffs' claims for retaliation. As noted, the defendants waived this issue at oral argument. We will nevertheless consider the defendants' argument about the evidence presented at trial regarding the alleged listening device to the extent that it pertains to Corder's claim for hostile work environment.

evidence of how the item got in the plaintiffs' truck or that it was a functional device.[6] The defendants also object to the plaintiffs' testimony at trial about their reaction upon discovering the object. The defendants insist that any evidence regarding the object should have been excluded as irrelevant pursuant to Tenn. R. Evid. 402 and as unfairly prejudicial pursuant to Tenn. R. Evid. 403.

We do not agree with the defendants' assertion that the plaintiffs were "allowed to speculate wildly about what [the object] may have been, why it may have been put there, and how it made them feel." The jury did hear testimony about how the plaintiffs felt upon discovery of the object. For example, Corder testified that he and Boone "knew that we had been violated," and it "made us feel real uncomfortable in that truck like we couldn't talk about anything." Boone stated that he felt "greatly violated" because he and Corder were accustomed to having conversations in the truck "about our families" and "day-to-day living." Corder and Boone both testified that after they first discovered the object, they began searching their vehicle each morning before beginning their routes. However, the jury also heard testimony from the plaintiffs that they had no proof of what the object was or how it got there. Corder testified that he did not know what the object was, what it did, and that "[a]nybody could have put it in there." Boone testified that he had "no proof" of how the thing got there and he did not "have a clue what it does."

The jury also saw video of the plaintiffs' City vehicle parked at the Department parking lot on Sunday, June 1, 2008, one day before the plaintiffs found the object in their truck. The video showed their supervisor, Johnny James, getting into their truck on that day. Before the video was played, James denied being in the plaintiff's vehicle on June 1, 2008. The timestamp on the video also revealed that there was missing footage. The jury heard the following testimony from James as the video was played at trial:

Q: And at 08:27:27, 08:27:28 you are entering [the plaintiffs'] truck, correct?

A: Yes, sir.

Q: And we'll note for the record that the timestamp, if you will agree with me, just picked up again at 8:28 flat, correct? Do you agree with me down there it's 8:28?

A: Yes, sir.

_____

[6] At trial, the defendants objected to use of the word "device" to describe the object that the plaintiffs found in their vehicle since there was no proof of its purpose. The parties instead referred to the object as a "thing."

Q: And it just ended at 08:27:28, correct?

A: Yes, sir.

Q: So that's 32 seconds that we don't know what happened?

A: Yes, sir.

Q: And we see you exiting the truck at that time, correct?

A: Yes, sir.

Q: So we have you entering the truck and the 32 seconds and then you exit the truck, correct?

A: Yes, sir.

. . .

Q: And then if you notice—if we can point down here at the counter, 08:31:39 you are entering their truck, 8:40 you are in the truck and then we jump ahead to 8:49; is that correct?

A: Yes, sir.

Q: Do you know what happened with nine seconds?

A: No, sir.

Q: But it looked to me as if you were entering their truck or at least leaning in their truck; is that correct?

A: Yes, sir.

Q: Do you know why there are nine seconds not on that tape?

A: No, sir.

James also testified about why he was at the Department parking lot that Sunday:

-10-

Q: What were you doing at the public works department that Sunday morning?

A: I was probably either looking for some tools or—I could have been doing anything. I'm surprised I didn't back it up against the fence. Usually if the trucks are sitting out usually I pull up and drive them to the back and park them because that's what we tell everybody. Park them against the fence. I'm surprised I didn't do it then. But I don't know what I was looking for. I can't—

Q: You don't have any idea why you were getting in that vehicle?

A: No, sir. I don't recall why I was there.

The defendants insist that it was plausible that James was retrieving work orders, which were often kept in the vehicles of Department employees, from the plaintiffs' vehicle on that Sunday. Additionally, the defendants claim that it is possible that the plaintiffs themselves planted the object to build their case. The defendants claim that, without proof of what the object was or how it got there, the probative value of the evidence was greatly outweighed by its inflammatory nature. They also insist that the "admissibility of evidence should not be an issue of credibility to be decided by the jury."

We conclude that the trial court did not abuse its discretion in admitting evidence about the alleged listening device. The plaintiffs did not assert that the object was a listening device. The jury heard Corder, Boone, and James testify that they did not know what the object was or how it got there. Its presence in their vehicle, no matter its functional capabilities, is probative of the existence of a hostile work environment. It was up to the jury to consider the testimony of James and the circumstances surrounding his presence in the plaintiffs' vehicle the day before the object was discovered. Because we find the trial court did not misconstrue or misapply controlling legal principles or act inconsistently with the substantial weight of the evidence, we conclude that the evidence about the alleged listening device was properly admitted. *See White*, 21 S.W.3d at 223.

### Jury Verdict in Favor of Corder's Hostile Work Environment Claim

The defendants claim that the jury verdict in favor of Corder's claim of hostile work environment is contrary to the weight of the evidence. The defendants challenge the fourth and fifth elements of a hostile work environment claim—that the harassment unreasonably interfered with Corder's work performance by creating an intimidating, hostile, or offensive work environment and that the employer is liable. *See Barrett*, 556 F.3d at 515.

-11-

In determining whether a plaintiff was subjected to a hostile work environment, the trier of fact must examine the totality of the circumstances. *Id.* The trier of fact must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted). In order to change the terms and conditions of employment, the discriminatory conduct must be extreme. *Id.* The conduct involves an objective component that asks whether a reasonable person would find the environment hostile and abusive, as well as a subjective component that asks whether the individual plaintiff viewed that environment as abusive. *Jackson*, 191 F.3d at 658. In addition to establishing that a hostile work environment existed, the plaintiff must also demonstrate that the employer knew or should have known about the harassment and failed to take remedial action. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 32 (Tenn. 1996).

The defendants rely on *Armstrong* as an example of a case where the level of discrimination did "not rise to the level of an objectively hostile work environment because it was not so severe and pervasive as to alter the conditions of [the plaintiff's] employment." *Armstrong*, 2010 WL 273691, at *9. In *Armstrong*, the Sixth Circuit noted that the trial court correctly dismissed the plaintiff's allegations of discrimination on the basis of a "handful of uses of the n-word and its derivatives, . . . some racist jokes . . . , a few references . . . to the Ku Klux Klan and James Earl Ray, and the presence of racist graffiti that was removed as soon as [the plaintiff] reported it to a supervisor." *Id.* However, the court also noted that the plaintiff's allegations concerning harassment were "more general than those of her co-plaintiffs" because they "concerned 'bad language' and 'cussing in general' directed at all employees, rather than specific racial harassment of African-American employees." *Id.* In the present case, the harassment took a more severe form than bad language and cussing, and the harassment was specific to African-Americans. The court in *Armstrong* actually reversed the trial court's grant of summary judgment with regard to these three other plaintiffs who endured other forms of harassment, including Caucasian employees wearing pins bearing images of the Confederate flag to work, a supervisor throwing out a birthday cake that had been baked by an African-American employee, an African-American employee finding human feces on the truck she used during her shift, a Caucasian manager telling an African-American supervisor that he was "the manager's ni****," and a Caucasian employee saying that "all ni***** were lazy." *Id.* at *8. The defendant in *Armstrong* argued that the court should exclude these three plaintiffs' allegations of continual racist conduct because they only recalled a few specific incidents. *Id.* The Sixth Circuit, however, noted the significance of the fact finder's role in evaluating the severity of the harassment, noting, "When a plaintiff

alleges commonplace, ongoing, and continuous harassment and provides specific examples of that harassment sufficient for a court to judge the objective severity of that harassment, a '[p]laintiff's inability to recount any more specific instances [of discrimination] goes to the weight of her testimony, a matter for the finder of facts.'" *Id.* (quoting *Abeita*, 159 F.3d at 252).

The defendants also rely on *Lovelace v. BP Products North America, Inc.* in which the appellate court sustained the trial court's grant of summary judgment to the employer. *Lovelace v. BP Prods. N. Am., Inc.*, 252 F. App'x 33, 42 (6th Cir. 2007). This case is also factually distinguishable. The Sixth Circuit's decision was largely based on one isolated incident that was not corroborated. *Id.* at 40. The court found that other instances of allegedly derogatory racial comments were instigated by the plaintiffs following that one incident. *Id.* The court further noted that "several of the allegations are unrelated to racial hostility and thus are not relevant to plaintiffs' race-based hostile work environment claims." *Id.*

The defendants insist that there was no legal or material evidence to support the verdict. In addition to the three evidentiary issues discussed above, the defendants also challenge other incidents of racial harassment upon which Corder relied in making his hostile work environment claim.

Comments

First, the defendants focus on comments made by Teresa Barrett. A Department employee, Ray Stillwell, testified that Barrett complained about an assignment she had been given by stating she was "tired of being everybody's 'N.'" Barrett's use of a racial slur occurred outside the presence of Corder, whom Stillwell subsequently told about the incident. Barrett was terminated. The defendants claim that Barrett's comment falls into the category of an "offensive utterance" because she was not referring to anyone or attacking anyone when she said it. As a result, the defendants insist that the incident should not be considered as causing or contributing to a hostile work environment.

The defendants also challenge two incidents in which statements were made about Martin Luther King, Jr. Day. On one occasion, an employee, Richard Sullivan, told an African-American employee, Norman Johnson, "Happy James Earl Ray Day." Johnson reported the incident to his supervisor. Sullivan was not reprimanded for the incident, but he did apologize to Johnson thereafter. Johnson told Corder about the incident. On another occasion, Barrett commented that "she didn't think it was right that we get off on some black person day and we don't even get off on President's Day." The comment was made in Corder's presence.

On another occasion, Jim Owens allegedly asked Gloria January whether she could believe that blacks were given the right to vote before women. The conversation took place in front of Corder. Owens denied making the statement at trial.

Another time, Baltimore told Corder "you must not realize what color you are" in response to Corder's statement that he was going to run for mayor in the next election. This was said in a room full of people.

The defendants claim that because Corder did not report any of these incidents to the City, the City was under no duty to take corrective action. Corder acknowledged that he did not report all of the instances he was aware of at the time they occurred. He testified that he "kept them bottled up," but that supervisors were present when the comments were made. The plaintiffs did approach Kathi Payne in February 2008. The impetus for that meeting was the incident between Barrett and Stillwell, but Payne testified that the plaintiffs discussed other instances of racial animosity at that meeting. Corder testified that Payne did not offer any kind of solution at that time. Rather, she told Corder and Boone that they should thank their supervisor, Johnny James, for allowing them to work special hours. Payne acknowledged that there was no policy in place at that time for handling or reporting racial discrimination.

Additionally, Payne testified that the plaintiffs had already spoken with James and Bob Burns, James's supervisor, about instances of racial harassment prior to that February 2008 meeting. Corder testified that he had spoken to James about comments made by one of his earlier partners, Derrick Rolland, that "some [black people] are niggers," that he did not understand why that word was offensive, and that he did not "believe in mixed relationships." Corder testified that James responded by telling Corder that "you guys need to get along." It is also of note that Corder testified about an instance in which his "supervisor," presumably James, told him that he "can't stand" Mexicans.

Dave Chappelle Video

At trial, Corder described an instance where he and his co-workers watched a video of the comedian Dave Chappelle at work. In the video, Chappelle, who is African-American, plays a member of the Ku Klux Klan who does not realize he is black because he is blind.

The defendants claim that because Corder willingly participated in watching and laughing at the video when it was first played, it was not subjectively offensive. We find this argument to be without merit since Corder testified that he found his co-workers' repeated use of the phrase "kill the niggers" after they viewed the video offensive.

-14-

## Storage Room Incident

Corder also testified about an incident that occurred between him and Baltimore in a storage room. According to Corder, he entered the storage room and, when he turned around, Baltimore was standing behind him with his hands behind his back. Corder testified that he was frightened because he "didn't know what he was going to do" and that Baltimore had a reputation for being verbally abusive or hostile. Corder testified that he asked Baltimore if he had a problem several times, and then Baltimore turned and walked away. Baltimore recounted the same version of events and stated that he "paid no attention to [Corder] because [he] had chosen to ignore all the stuff that was going on." Corder reported the incident to James and Mark Moshea, the city administrator.

The defendants insist that while Baltimore's behavior might have been rude, it was not hostile or racially motivated. It was a matter for the jury to decide whether Baltimore's actions were hostile or racially motivated. The jury heard the accounts of both Corder and Baltimore, as well as Oscar Leezy, a co-worker who was present at the time and stated that Baltimore did not seem upset upon exiting the storage room. The jury also heard testimony about Baltimore's earlier statement to Corder that "you must not realize what color you are," as well as testimony from others about Baltimore's general demeanor at work.[7] Corder also testified about the change in Baltimore's attitude toward him after he filed his EEOC complaint: "He had been staring me down as I come in and stuff, you know, he would fold his arms up like this (indicating) he was staring me down like this as I walk into the shop and just look at me all the way until I clock in every morning." Taking all of these events into account, the jury was entitled to consider the evidence and determine whether the storage room incident was proof of a racially hostile work environment.

## Totality of the Circumstances

In determining whether a plaintiff was subjected to a hostile work environment, the trier of fact must examine the totality of the circumstances. *Barrett*, 556 F.3d at 515. We find that, with the exception of Baltimore's statement to Payne and Hiles's testimony about Baltimore, the incidents described above were properly considered in evaluating the frequency and severity of the discriminatory conduct and whether it unreasonably interfered with Corder's work performance. *See Harris*, 510 U.S. at 17.

---

[7] For example, William Pittman, a City employee, testified about an occasion on which Baltimore cursed at him. Oscar Leezy, another City employee, testified that Baltimore fussed or yelled at people and that he often overreacted.

The defendants argue that while the comments made were racially offensive, they do not demonstrate an abusive work environment. We believe that, based on the evidence presented, a jury could have concluded that Corder was exposed to discriminatory conduct that a reasonable person would have found created a hostile and abusive work environment. *See Jackson*, 191 F.3d at 658. Corder testified that he was exposed to racial slurs on a daily basis. The testimony of other witnesses corroborated his assertion. For example, Ray Stillwell and Johnny James each testified that they heard the use of racial slurs and comments in the workplace. Wiliam Pittman, a City employee, identified five different employees whom he heard make racial comments in the workplace and "all kinds of jokes . . . every time you turn around." He testified that he heard Baltimore use the term "nigger" at work, and that another man referred to an African-American as a "black biscuit." Even Baltimore acknowledged the use of racially hostile language in the Department. When he was deposed, Baltimore stated that a co-worker, Howard Woody, said in reference to Corder, "we finally got us a nigger." Baltimore further stated that he was "quite sure" there were additional racial comments made, though he said he could not identify them.

Because we conclude that there was material evidence to support the jury's verdict, we affirm the trial court's finding of a hostile work environment with respect to Corder. *See* Tenn. R. App. P. 13(d).

Verdict for Compensatory Damages

The jury awarded Corder $350,000 and Boone $300,000 in compensatory damages. Both parties agree that the jury's verdict consists almost entirely of damages for humiliation and embarrassment. The defendants challenge the jury verdict for compensatory damages for humiliation and embarrassment as grossly excessive and outside the range of damages reasonably supported by the evidence.

Damages for humiliation and embarrassment may be awarded under the Tennessee Human Rights Act. Tenn. Code Ann. § 4-21-306(a)(7). "The amount is peculiarly within the province of the jury subject to the rule of reasonableness, and necessarily depends on the articulation of personal shame experienced by the discharged plaintiff together with the jury's perception of his sensitivities." *McDowell v. Shoffner Indus. of Tenn., Inc.*, No. 03A01-9301-CH-00030, 1993 WL 262846, at *4 (Tenn. Ct. App. July 13, 1993). An appellate court may only disturb a damage award if there is no material evidence to support the award. *Campbell v. Rust Eng'g Co.*, No. 90-5679, 1991 WL 27423, at *6 (6th Cir. Mar. 5, 1991) (citing *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980)). Courts may consider evidence relating to the effect the discrimination has had on the plaintiff's personality, state of mind, family lifestyle, schedule, and sleeping and eating habits. *See Thompson v. City of LaVergne*, No. M2003-02924-COA-R3-CV, 2005 WL 3076887, at *12-

13 (Tenn. Ct. App. Nov. 16, 2005). The analysis is necessarily subjective in nature. *See id.* at *13 (noting that changes in the plaintiff's life "must also be considered in the context of his circumstances before and after [his] transfer"); *McDowell*, 1993 WL 262846, at *4 (noting that a "summary discharge on account of age might be devastating to a person of refinement and gentle nature, while of little consequence to a person less sensitive or more calloused").

When asked what his experience working for the City had been like, Boone responded that "it was hell." He testified that he feared for his safety at points, had difficulty getting out of bed, and lost thirty pounds in a matter of months. Boone testified that he "didn't feel safe driving a truck" or "operating machinery" because of his anxiety episodes. Boone went on medical leave in September 2008 and sought treatment for his anxiety from Melissa Ott, a psychiatric nurse practitioner. Ott diagnosed him with depression anxiety, and Boone was put on medication, which he was taking at the time of trial. Boone testified that his medication costs $83 per month and his counseling costs $38 per appointment. Boone's employment with the City ended in March 2009 when his six-month medical leave ran out. He testified that he has not been able to find employment. Boone's aunt testified that his personality changed "a whole lot" as a result of his job-related stress. She testified that while he used to be outgoing and very involved with his children, he is now withdrawn and no longer coaches his daughter's sports teams.

When asked about the effect his job experiences had on him, Corder testified that "there was [sic] times that I felt like giving up on everything." Corder stated that he began shutting out his family. He testified that he "didn't want to be around my family, lost the relationship with my kids and my wife because of this situation." He stated that his wife had sought treatment because of his stress and depression and was now taking medication. Corder's mother testified that her son's personality had changed as a result of his job-related stress. She stated that he is "very distant" now. Corder's wife testified that Corder had "basically secluded himself, just—just wants to stay home, doesn't want to go anywhere or do anything." She stated that their children "haven't been in sports for two years now since this started." She testified that Corder became very concerned about their interracial marriage and how it would be perceived by others. Like Boone, Corder took a leave of absence for job-related stress and sought counseling with Ott, who also prescribed him medication. He obtained a job with the Town of Smyrna where he began working in December 2008.

The City cites four employer discrimination cases in support of its position that the amount of damages awarded to the plaintiffs is excessive and unsupported by the evidence:

- In *Forbes*, the appellate court suggested that the demoted plaintiff's $250,000 award for humiliation and embarrassment be reduced to $75,000. *Forbes v. Wilson County Emergency Commc'n Dist. 911 Bd.*, No. 01A01-9602-CH-00089, 1998 Tenn. App. LEXIS 340, at *13 (Tenn. Ct. App. May 20, 1998).[8] The court based its opinion on the fact that the plaintiff did not offer any evidence from a psychiatrist or psychologist regarding her alleged emotional injury and she was not prescribed any long-term medication. *Id.* at *8, 13.

- In *Campbell*, the jury awarded the discharged plaintiff $68,897 in damages for embarrassment and humiliation. *Campbell*, 1991 WL 27423, at *5. The appellate court ordered a remittitur reducing the amount to $10,000. *Id.* at *6. The court noted only two pieces of evidence upon which the jury relied: the plaintiff's testimony that the layoff "hurt [him] quite a bit" and that he was embarrassed whenever he saw his former co-workers. *Id.* at *5. Additionally, the court noted that the plaintiff suffered no aggravated injuries as a result of his layoff, only those normally associated with losing a job, which the court described as "overall disappointment about not being employed." *Id.* at *6. Finally, the court stated that the award was excessive in light of "the generous front pay award by the jury." *Id.*

- In *Harris*, this court suggested a remittitur to $20,000 from the jury's award of $100,000 for humiliation and embarrassment suffered by a discharged employee for age discrimination. *Harris v. Dominion Bank of Middle Tenn.*, No. 01A01-9609-CH-00444, 1997 WL 273953, at *4 (Tenn. Ct. App. May 23, 1997). The court noted that the plaintiff offered the only testimony about his humiliation and embarrassment, which consisted of statements that "it was pretty humiliating to be the age that I was and to suddenly find out you no longer have a job," that he "didn't have a problem sleeping" but that he was embarrassed "to get out in public," and that it did not make him "feel good." *Id.* The court concluded that the plaintiff did not suffer any aggravated injuries, and thus, the award was excessive. *Id.*

- In *Barnes*, this court affirmed the trial court's remittitur of an award for humiliation and embarrassment from $150,000 to $75,000. *Barnes v. Goodyear Tire & Rubber Co.*, No. W2000-01607-COA-RM-CV, 2001 WL 568033, at *1 (Tenn. Ct. App. May 25, 2001). Again, the court stated that, in the absence of any aggravating injuries, the award was excessive. *Id.* at *9. The court noted the plaintiff's testimony that he was devastated, in a state of shock, not himself, and "so low" that he did not want to see anyone. *Id.*

---

[8] Westlaw citation not available.

Plaintiffs Boone and Corder and others testified that their injuries were more pronounced than simple disappointment and actually affected their health. Additionally, the cases upon which the defendants rely do not include instances where the plaintiffs sought professional counseling or treatment. The plaintiffs rely on *Thompson v. City of LaVergne* in support of their argument that the jury's award is reasonable. In *Thompson*, a City of LaVergne police officer claimed that he was demoted as a result of investigating the alleged sexual harassment of a police officer by the administrative assistant to the chief of police. *Thompson*, 2005 WL 3076887, at *1. A jury awarded the plaintiff $450,000 for embarrassment and humiliation, which was reduced to $300,000 by the trial court and upheld on appeal. *Id.* at *12. This court noted that, while trial judges have a duty to independently weigh the evidence and change the verdict if they disagree with it, appellate courts must support the amount approved by the trial court if there is material evidence to support the verdict. *Id.* The court considered the following in upholding the $300,000 award: the plaintiff's wife's testimony about her husband's change in enthusiasm for his job following the incident; a change in his personality at home to being short-tempered, preoccupied, withdrawn, and irritable; a change in family lifestyle because of schedule changes due to his transfer; a new sense of despair and loss of faith concerning his job; the plaintiff's feeling that he was shunned by other officers; and his belief that his opportunity for advancement had been permanently damaged. *Id.* at *12-13. The court concluded that, based on these factors, there was material evidence to support the jury's award, which the court did not find unreasonably excessive. *Id.* at *13.

The jury heard similar testimony about the effect on the plaintiffs of working for the City in this case. Because we believe there is material evidence to support a verdict in that amount, we find no error in the amount of the judgment for humiliation and embarrassment approved by the trial court. *See* Tenn. R. App. P. 13(d); *Campbell*, 1991 WL 27423, at *6.

CONCLUSION

The judgment of the trial court is affirmed. Costs of appeal are assessed against the appellants, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

-19-